CHARLES E. DOLE & another *vs.* THE NEW ENGLAND MUTUAL MARINE INSURANCE COMPANY.

THE SAME *vs.* THE EQUITABLE SAFETY INSURANCE COMPANY.

A warranty by the insured in a policy of insurance that the vessel shall be free from capture, seizure or detention, includes a capture by a cruiser of the so-called Confederate States.

In case of a warranty by the insured in a policy of insurance that the vessel shall be free from capture, seizure or detention, the liability of the insurers is terminated by a capture by a cruiser of the so-called Confederate States, so that they are not liable for the burning of the vessel immediately thereafter, although the policy contains a provision that in case of capture or detention the insured shall not have the right to abandon therefor until proof is exhibited of condemnation, or of the continuance of the detention by capture or other arrest for at least ninety days.

Under a policy of insurance of a vessel against perils of the seas, fire, enemies, pirates, assailing thieves, restraints and detainments of all kings, princes or people, &c., with an agreement contained in the policy that in case of capture or detention the insured shall not have the right to abandon therefor until proof is exhibited of condemnation, or of the continuance of the detention by capture or other arrest for at least ninety days, and that the insurers shall not be answerable for any charge, damage or loss which may arise in consequence of seizure or detention for or on account of illicit or prohibited trade, or trade in articles contraband of war, a printed stipulation in the margin of the policy, by which the insured warrant the vessel free from capture, seizure or detention, any stipulation in the policy to the contrary notwithstanding, exonerates the insurers from liability, in case of a capture by a cruiser of the so-called Confederate States.

Two actions of contract upon policies of insurance dated on the 19th of November and the 17th of December 1860, respectively, by the first of which the defendants in the first action insured the plaintiffs in the sum of $10,000, and by the second of which the defendants in the second action insured the plaintiffs in the sum of $5000, on the ship Golden Rocket for one year. Each policy contained the following provisions :

" Touching the adventures and perils which the said insurance company are contented to bear and take upon them in this voyage, and for which the funds only of this company are bound, they are of the seas, fire, enemies, pirates, assailing thieves, restraints and detainments of all kings, princes or people, of what nation or quality soever, barratry of the master (unless the insured be owner of the vessel) and of the mariners, and all other losses and misfortunes which have or shall come

to the damage of the said vessel, or any part thereof, to which insurers are liable by the rules and customs of insurance in Boston." "It is also agreed that, in case of capture or detention, the insured shall not have the right to abandon therefor until proof is exhibited of condemnation, or of the continuance of the detention (by capture or other arrest) for at least ninety days." "It is also agreed that the insurers shall not be answerable for any charge, damage or loss which may arise in consequence of seizure or detention for or on account of illicit or prohibited trade, or trade in articles contraband of war."

In the margin of the first policy, this clause was printed: "Warranted free from capture, seizure, detention, or the consequence of any attempt thereat; the clause herein embodied, touching said perils or adventures, to the contrary notwithstanding." And in the margin of the second policy: "Warranted by the assured free from loss or expense arising from capture, seizure, detention, or the consequences of any attempt thereat; any stipulations in this policy to the contrary notwithstanding."

The declaration in each case contained six counts, respectively averring a total loss, 1st, by perils of the seas; 2dly, by fire; 3dly, by pirates; 4thly, by assailing thieves; 5thly, by assailing thieves and by fire; 6thly, that the Golden Rocket was taken by an armed vessel, claiming and pretending to act under the authority of a pretended and simulated government instituted by rebellious subjects of the United States, and called by its inventors and supporters the Confederate States of America; that the officers of said armed vessel, with a force which the officers and crew of the Golden Rocket were unable to resist, took out those officers and crew, and took and carried away and converted to their own use a portion of the tackle, apparel, &c. of the Golden Rocket; that the Golden Rocket was afterwards totally destroyed by fire; and that, by the rules and customs of insurance in Boston at the date of the policy, insurers were liable for such loss.

At the trial in this court, before *Hoar,* J., (the two actions being tried together,) the plaintiffs' interest, and due notice, proof of loss, and demand of payment as for a total loss, were

admitted. It also appeared by the evidence, and by the admission of the defendants, that on the 3d of July 1861 the Golden Rocket was taken with an irresistible force by the Sumter, an armed steamer claiming to act under the so-called Confederate States, and first deceiving the officers of the Golden Rocket by displaying a United States flag; that Raphael Semmes, the commander of the Sumter, was a citizen of Maryland, which has never seceded, and most of the other officers were citizens of certain of the United States which are pretended to have seceded; and that after removing the officers and crew of the Golden Rocket, and plundering her of some sails, spars, provisions and other articles, they burned her.

The defendants contended that upon this evidence the actions could not be maintained; and also offered to prove that on the 20th of December 1860 the people of South Carolina, in convention assembled, passed an ordinance repealing the ordinance whereby they had previously ratified the constitution of the United States of America, and ordaining that the Union heretofore existing between South Carolina and the other states, under the name of the United States of America, be dissolved; and that all the powers delegated by South Carolina to the government of the United States be resumed, and that the state of South Carolina be henceforth a sovereign and independent state; that similar ordinances of secession were severally passed subsequently by the people of the following named states, viz: of Mississippi, on the 9th of January 1861; of Florida and Alabama, on the 11th of January 1861; of Georgia, on the 19th of January 1861; of Louisiana, on the 26th of January 1861; of Texas, on the 2d of March 1861; that immediately after said ordinances of secession were passed, the people of said several states expelled the officers of the United States from their respective territorial limits, or by force prevented their official action, with the exception of a few military posts in South Carolina and Florida; that on the 6th of February 1861 the deputies of said states met in convention in Montgomery, in the state of Alabama, and there organized a confederacy of said states, and a government for said confederacy, called the

government of the Confederate States of America, and established a written constitution therefor, modelled upon and in the distribution of powers similar to the constitution of the United States; that, directly thereafter, said government was organized in all its departments, legislative, executive and judiciary, and on the 3d of July 1861 was exercising all the functions of government throughout the territorial limits of said states, except the military posts before mentioned, in all matters in which theretofore the government of the United States had exercised jurisdiction within said territorial limits, especially in all matters appertaining to the levying of war, to the exclusion of the authority of the United States; that prior to April 9th 1861 the so-styled Confederate States of America had raised and organized an army and created a navy; and on the 6th of May 1861 the congress of the so-styled Confederate States of America published an act, which they had previously passed, declaring that war then existed between the Confederate States and the United States, and providing measures for its vigorous prosecution, which said war has continued from that time to the present; that the people of Virginia, Arkansas, North Carolina and Tennessee passed or adopted ordinances of secession from the United States, similar to those which had been passed by the states hereinbefore mentioned, and placed themselves under the government of the so-styled Confederate States, prior to May 15 1861; that the Sumter, the ship by which the Golden Rocket was taken and destroyed, was a public armed vessel of the so-styled Confederate States of America, purchased, armed, equipped and manned by them, with officers commissioned in due form, and mariners enlisted in its navy, and was, at the time of said capture and destruction, cruising under a commission from said government to attack, capture or destroy the vessels belonging to the government of the United States, or to any citizens thereof, and none other; that said Semmes, who was in command of the Sumter at the time of said capture and destruction, had the commission of a captain in the navy of said Confederate States, and in all his proceedings in the premises was acting under the authority and in obedience to the

orders of the said self-styled Confederate States; that said captain was prevented from taking the Golden Rocket into port by want of men to man her, and by the danger and difficulty arising from the blockade of the ports of said Confederate States by the government of the United States; that at the time of said destruction the so-called Confederate States of America were carrying on hostilities by land and sea against the United States, and had for that purpose an army of over 50,000 men in the field; and held possession of and exercised all the functions of government over all the territory included within the limits of the said Confederate States, to the exclusion of the United States, except a few military posts on the Gulf of Mexico and a portion of the state of Virginia, which were held by the military power of the United States; that whatever was done by the officers and crew of the Sumter was done under said authority, so before stated, and for the purpose of prosecuting said war so declared to exist, and with the sole design and intent of coercing the government of the United States to acknowledge the independence of said Confederate States; that vessels which were sailing under commissions similar to the said commission of the Sumter have been from time to time captured by the public armed vessels of the United States, and that in all these cases the officers and crews of such vessels have, since the loss of the Golden Rocket, been treated as prisoners of war, and exchanged as such; that since the commencement of hostilities the public armed ships of the United States have claimed and exercised the right to visit and search neutral ships on the ocean, and many such neutral ships have been captured, and with their cargoes condemned for having contraband of war on board, destined to some port in a seceded state, and many others, for attempting to break the blockade declared by the proclamations of the president of the 15th and 27th days of April 1861; that all property belonging to persons resident in the seceded states, and found on the sea, has been, pursuant to the orders of the president, captured, proceeded against and condemned as lawful prize of war in the admiralty courts of the United States, upon the allegation, in such cases required to be made and proved, that the

same was enemies' property ; and that the governments of France and England had, as early as June 1st 1861, recognized the so styled Confederate States and the government of the United States as belligerents, and entitled equally to the same rights and privileges as belligerents.

The people of the so-styled Confederate States, and their assumed government, being conceded to be in a state of rebellion against the government of the United States, the judge, in order to settle the questions of law involved, ruled that the evidence offered by the plaintiffs was sufficient to maintain these actions ; and that the evidence offered by the defendants was immaterial, and if introduced would not defeat the plaintiffs' right to recover ; and reported the cases to the full court, with an agreement that if this ruling was according to law the defendants should be defaulted ; but if, on the proof offered by the plaintiffs, the actions cannot be maintained, or if the evidence offered by the defendants is material, the cases should stand for trial. It was further agreed that the effect or legality of any of the acts, proceedings or facts herein enumerated and offered to be proved, as affecting the rights of the parties, should be considered and determined by the court ; and that, at the argument, any printed document of the government of the United States or its officers, or of the so-called Confederate States or their officers, might be referred to by either party ; saving all substantial objections to their admissibility or legal effect.

*R. H. Dana, Jr. & H. Gray, Jr.*, for the plaintiffs. I. The loss was by " pirates and assailing thieves," within the terms of the policy ; and therefore total, as soon as the ship was taken. [The argument upon this point is omitted.]

II. This piratical taking was not a loss within the exception in the margin of the policy. The language of the exception is to be interpreted with reference to the text of the policy, and, being inserted by the insurers for their own benefit, is, in case of doubt, to be interpreted most strongly against them. *Yeaton* v. *Fry*, 5 Cranch, 341. *Palmer* v. *Warren Ins. Co.* 1 Story R. 364. *Faudel* v. *Phœnix Ins. Co.* 4 S. & R. 59, 60, 63, 65, 69. The rule of interpretation stated in 1 Duer on Ins. 163, is not sound.

The policies specify two classes of risks from other than natural causes: 1st, acts on the responsibility of governments, as "enemies," "restraints and detainments of kings, princes and people," &c.; 2dly, individual depredations, as "pirates, assailing thieves." For the former the person injured may have redress through his own government; and they cannot well be made subjects of standing calculations. The latter may be averaged by tariffs of premiums; and against them he must protect himself. The former are not, while the latter are, included under "perils of the seas." 3 Kent Com. (6th ed.) 216, 300, 303, and cases cited. 1 Phil. Ins. §§ 1106, 1108. 2 Arnould on Ins. 808, 812, 817. Maude & Pollock on Shipping, 23, 231, 232. 2 Parsons Mar. Law, 236, 246. 2 Molloy, *c.* 7, § 14. *Garrison* v. *Memphis Ins. Co.* 19 How. (U. S.) 314. These policies, therefore, text and margin together, exclude the former from standing insurance, leaving them to special agreements, while they include the latter.

The words "capture, seizure and detention" are either used in the broadest and most general sense, in which case nothing would be covered by the policy but losses by fire and water; or else they are used technically. Now they are all used in the text of the policy as applied to acts of governments only. It is well settled that the words "restraints and detainments of all kings," &c., extend only to acts of governments. *Nesbitt* v. *Lushington,* 4 T. R. 787, 788. *Bradlie* v. *Maryland Ins. Co.* 12 Pet. 402. So the policy speaks of "seizure or detention" for illicit or contraband trade. And it provides that "in case of capture or detention," the insured shall not have the right to abandon until condemnation or detention for ninety days. Can pirates condemn? And can our courts recognize any condemnation within the territory of the United States, without a judicial commission from the president? *Tirrell* v. *Gage,* 4 Allen, 249, 250. *The Lilla,* 25 Law Reporter, 81, 89. *Barney* v. *Maryland Ins. Co.* 5 Har. & Johns. 139, 141. Or out of that territory, except under a commission from a power recognized by the United States as entitled to the rights of a belligerent? *Williams* v. *Armroyd,* 7 Cranch, 423. *The Nueva Anna & Liebre,* 6 Wheat. 193.

" Capture " and " seizure " are naturally and usually applied to acts of governments only; and they have often been used in such a manner as to show, of necessity, that this was the meaning attached to them — as in conferring jurisdiction upon prize courts. See Ordinances of Congress of Confederation, of 1780–1782, 5 Wheat. (Appx.) 115, 120, 126; British Orders in 1812, Stewart Adm. R. (Appx.) ix, xv; Queen's Proclamation of March 29, 1854, 1 Spinks, (Appx.) ii; Answer of 1753 to Prussian Memorial, 1 Collect. Jurid. 130, 132, 137; Articles of Con federation, art. 9, § 1; Const. of U. S. art. 1, § 8; *St.* of U. S. of 1862, *c.* 50, § 5. Especially has capture been used in this sense, as applied to marine insurance. 1 Park on Ins. (7th ed.) 108. 1 Phil. Ins. §§ 1108–1110. 2 Arnould on Ins. 807. 1 Kent Com. 100; 3 Ib. 303, 304. *Richardson* v. *Maine Ins. Co.* 6 Mass. 109. *Rhinelander* v. *Ins. Co. of Pennsylvania*, 4 Cranch, 42. The common meaning of " seizure " is an arrest by act of government, either by the municipal law or the law of prize. *The Caledonian*, 4 Wheat. 103. *The Apollon*, 9 Wheat. 372. *Carrington* v. *Merchants' Ins. Co.* 8 Pet. 518, 519. But " seizure," when used in connection with " capture," is *ejusdem generis*, though it may include cases in which no condemnation to change the title is looked for. *The Diligentia*, 1. Dod. 405. *The Amor Parentum*, 1 C. Rob. Adm. 303. *The Eagle*, 1 W. Rob. Adm. 246. *Lubbock* v. *Potts*, 7 East, 449, 451. *Mellish* v. *Andrews*, 15 East, 15, 16. *Powell* v. *Hyde*, (Erle and Coleridge, JJ.) 5 El. & Bl. 610, 611. *Black* v. *Marine Ins. Co.* 11 Johns. 292. *Jecker* v. *Montgomery*, 13 How. (U. S.) 515. Halleck on International Law, *c.* 12, § 14.

In *Goss* v. *Withers*, 2 Burr. 693, 694, the expressions of Lord Mansfield, giving countenance to a contrary use of the word " capture," are merely *obiter*, and are accompanied by statements of doctrines which were then incorrect or have since been overruled or questioned; and they are probably misreported. *Case of Piracy*, 12 Co. 73. *Greenway & Baker's case*, Godb. 193. 2 Wooddes. Lect. 431. *Hamilton* v. *Mendes*, 2 Burr. 1212. *Alexander* v. *Baltimore Ins. Co.* 4 Cranch, 379. *Thornely* v. *Hebson*, 2 B. & Ald. 518. *Falkner* v. *Ritchie*, 2 M. & S. 293. Pref. to

1 Burr. ix, x. In *Mc Cargo* v. *Insurance Companies*, 10 Rob. (Louis.) it was not suggested, either in the argument or in the opinion, that the loss, where slaves mutinied, was by "capture." See pp. 202, 297, 301, 312, 313, 328, 335–339, 351, 354. The only case in which "seizure" has been said to include acts of individuals, not acting under the authority of a recognized government, is *Kleinwort* v. *Shepard*, 1 El. & El. 447, and 5 Jur. (N. S.) 863, which rests on unsatisfactory reasons. And the English policies do not contain the clause requiring condemnation or ninety days' detention, to make a loss by capture total. Vaucher on Ins. 29, 46, 47, 88, 89, 126, 130, 165, 167, and table III.

In the maritime law, "prises et detentions" do not include taking by pirates. Emerigon des Assurances, *c*. 12, sects. 18, 28. 2 Valin Ordon. de la Mar. liv. 3, tit. 6, art. 26. "Prise" is not synonymous with "capture." Fleming & Tibbins' Dict. *Prise*. Blackburn, *arguendo*, *Kleinwort* v. *Shepard*, *ubi supra*. The clause in question is generally known as the war clause, and has long been in common use. *Green* v. *Brown*, 2 Stra. 1199 *O'Reilly* v. *Royal Exchange Assurance*, 4 Camp. 246. *Hahn* v. *Corbett*, 2 Bing. 205. *Mc Cargo* v. *New Orleans Ins. Co.* 10 Rob. (Louis.) 313. These policies were issued before any of the states had undertaken to secede, or any danger was apprehended from their cruisers. It has been the usage of insurers under like policies to pay losses by piracy. And the only American decision upon this clause is directly in point for the plaintiffs. *Swinnerton* v. *Columbian Ins. Co.* N. Y. Superior Ct. 1862, not yet reported.

III. If this taking was a loss within the exception, then by the terms of the policy the loss was not total until condemnation, or the continuance of the detention for ninety days. But before condemnation and within the ninety days, the ship was totally lost by fire; a distinct peril, for which the underwriters are liable. *Jones* v. *Schmoll*, 1 T. R. 130, 131, *n.* *Livie* v. *Janson*, 12 East, 654. *Commonwealth* v. *Desmarteau*, 15 Gray, . Emerigon des Assurances, *c*. 12, sect. 17, § 1. *Garrison* v. *Memphis Ins. Co.* 19 How. (U. S.) 314. *Airey* v. *Merrill*, 2 Curt. C. C. 11

*Pelly* v. *Royal Exchange Assurance*, 1 Burr. 341. *Dorr* v. *Union Ins. Co.* 8 Mass. 504. *Delano* v. *Bedford Ins. Co.* 10 Mass. 353, 354, approved in 4 Gray, 398. *Law* v. *Goddard*, 12 Mass. 113, 114. *Lovering* v. *Mercantile Ins. Co.* 12 Pick. 369. *Barney* v. *Maryland Ins. Co.* 5 Har. & Johns. 139. And this is in accordance with the application, in other cases of marine insurance, of the general maxim, *causa proxima, non remota, spectatur.* *Hagedorn* v. *Whitmore*, 1 Stark. R. 157. *Hodgson* v. *Malcolm*, 2 N. R. 340. *Redman* v. *Wilson*, 14 M. & W. 476. *Green* v. *Elmslie*, Peake R. (3d ed.) 278, approved in 12 Mass. 114, 234. *Livie* v. *Janson*, 12 East, 648, approved in 4 Gray, 399. *Ricè* v. *Homer*, 12 Mass. 234. *Forster* v. *Christie*, 11 East, 205. And see *Denny* v. *New York Central Railroad*, 13 Gray, 481. Although possession had been taken of the vessel, she might have been restored within twenty-four hours. Capture is not an absolute total loss, but a constructive total loss, requiring abandonment to make it complete ; and abandonment is at the election of the assured. Therefore this taking, if it was not a risk covered by the policy, did not put an end to the policy, there having been no condemnation or other act to change the title, and these being time policies, so that no question of breaking up the voyage can arise.

*B. R. Curtis & A. H. Fiske,* (*J. J. Storrow* with them,) for the defendants. There is a distinction between general piracy, known to the law of nations, and statute piracy ; and when a policy of insurance uses the word " pirates," it uses it in reference to the general maritime law of the world, and the meaning is not to be sought in the criminal statutes of our own country. The first question before the court is, whether a cruiser, duly commissioned, under a *de facto* government which is actually carrying on war, is guilty of piracy under the law of nations, when he makes a capture under his commission. [The argument upon these points is omitted.]

The warranty by the assured against capture, seizure and detention takes this loss out of the policy. Any capture or seizure, whether rightful or wrongful, and whether made under a commission from a *de jure* or *de facto* government or made

by mere pirates, is equally within this warranty. Such is the interpretation of these words by writers of authority and by courts. [Many authorities referred to in the opinion were here cited, and also the following.] Pothier Ins. § 54. 2 Boulay Paty Droit Com. et Mar. (ed. of 1838) § 16, p. 102. *Mc Cargo* v. *New Orleans Ins. Co.* 10 Rob. (Louis.) 202. *Mc Cargo* v. *Merchants' Ins. Co.* Ib. 334. 1 Kent Com. (6th ed.) 108. 2 Arnould on Ins. 817, 1115, 1116, 1117. Halleck on International Law, *c.* 12, § 14. Godolphin Adm. Jur. (ed. of 1685) 43, 44. Benecke, 230. *The Hercules,* 2 Dod. 358, 359. *The Helena,* 4 C. Rob. Adm. 5. *The Dickenson,* Marriott, 46. *Nesbitt* v. *Lushington,* 4 T. R. 787. *Naylor* v. *Palmer,* 8 Exch. 739, 750. *Mellish* v. *Andrews,* 15 East, 15. *United States* v. *Klintock,* 5 Wheat. 150. *Davison* v. *Seal Skins,* 2 Paine, C. C. 333. *Parsons* v. *Massachusetts Ins. Co.* 6 Mass. 208. *The Wanderer,* Sprague's Decis. 521. *The Lilla,* 25 Law Reporter, 89. Pritchard's Dig. p. 147, § 23. *United States* v. *The Malek Adhel,* 2 How. (U. S.) 233. *St.* of U. S. of 1861, *c.* 33. President's Proclamations of April 15th and 27th, 1861. *Tirrell* v. *Gage,* 4 Allen, 248, 249.

The true rule in interpreting the words is, that the meaning that was present to the minds of the parties *is* that which the words they have used immediately suggest to the minds of others. Duer on Ins. 163.

But if it were admitted that the warranty refers only to acts of government, it by no means follows that no sufficient government existed. If the facts stated are true, there was an act of a *de facto* government; and this is sufficient. It is conceded that the words "restraints and detainments" refer to acts of governments; but it is because the words which follow them, "of all kings, princes or people," qualify their meaning.

The effect of the clause in the margin is, that there is no insurance against capture; and therefore the provisions in the body of the policy for the case of capture do not apply. The defendants' liability was terminated by the capture. See *Magoun* v *New England Ins. Co.* 1 Story R. 157.

BIGELOW, C. J.* We do not deem it necessary to the decision ⸱f these cases to determine the precise nature of the acts by which the plaintiffs' ship was taken possession of and burned, or the exact legal *status* to be ascribed to the persons by whom this depredation and destruction were committed. The question which such an inquiry would open is certainly a very interesting and important one, and it has been very fully and ably discussed before us; but, in the view which we have taken of the contract declared on, its determination is immaterial to an ⸱adjudication on the rights of the parties to these actions.

The policies on which the plaintiffs seek to recover contain the usual clause descriptive of the risks which the insurers are contented to bear, as follows : " the sea, fire, enemies, pirates, assailing thieves, restraints and detainments of all kings, princes or people, of what nation or quality soever, barratry of the master, (unless the insured be owner of the vessel,) and of the mariners, and all other losses and misfortunes which have or shall come to the damage of the said vessel or any part thereof." In the margin of one of the policies there is a printed stipulation of this tenor, viz : " Warranted free from capture, seizure or detention, or the consequences of any attempt thereat; the clause herein embodied touching said perils or adventures to the contrary notwithstanding." In the other policy a similar warranty is thus expressed: " Warranted by the assured free from loss or expense arising from capture, seizure, detention, or the consequences of any attempt thereat, any stipulations in the policy to

---

* An action in favor of SUCHET MAURAN 2d *v.* THE ALLIANCE INSURANCE COMPANY was considered at the same time with the above cases, and decided in favor of the defendants, for the same reasons stated in the above opinion. This was an action upon a policy of insurance by which the defendants insured the plaintiff in the sum of $8000 on the ship Marshall, and the policy contained the same warranty in the margin with the second one above recited. The ship was destroyed within the time covered by the policy under circumstances quite similar to those recited above.

G. A. *Somerby,* for the plaintiff.

B. R. *Curtis & A. H. Fiske,* (*M. Andros* with them,) for the defendants, waived the argument in this case, it being understood that their whole argument should be made in the above cases, which were taken up next in order.

the contrary notwithstanding." The purpose of inserting this warranty is manifest. It is designed to exempt the insurer from certain risks which are enumerated in the general clause above cited, and in legal effect strikes them from the contract. Of these excepted risks for which the insurer is not to be liable, the first named is a loss of the vessel by capture. It is contended on the part of the defendants that the facts proved at the trial bring these cases within the fair meaning of the warranty, and that the plaintiffs are not entitled to recover on the policies, whether the ship was taken by persons who may be properly designated as pirates or not, or whether their acts were lawful or unlawful, because the loss was caused by acts which constitute a capture, in the sense in which that word is used in the contract. We are then to inquire into and ascertain what is the true interpretation of a warranty " free from capture " in a policy of marine insurance. In pursuing this inquiry, we think it must be admitted that if it is found that there is any doubt or ambiguity concerning the meaning of the word, that interpretation of it is to be adopted which is most favorable to the claims of the assured under the policy. This is the ordinary and familiar rule applicable to the construction of all policies of insurance. It is founded on the consideration that, the contract of insurance being one of indemnity to the assured, it is most consonant to the intent of the parties to construe it so that the extent of the indemnity shall be as great as a just interpretation of its terms will fairly admit. Especially is this rule to be applied in giving a construction to a warranty like that in question, which creates an exception from the risks enumerated in the body of the policy, and is therefore to have no broader operation to abridge the indemnity to which the assured is entitled under his contract than is fairly required to give full and fair effect to the language used. But it is to be borne in mind that this salutary and well established rule of interpretation can have no application to a case where the terms of the policy are clear and unambiguous. It is not to be resorted to in order to support a construction of the contract which distorts its language or perverts it from its plain and legitimate meaning. **Nor**

can it be properly used to warrant an interpretation which would tend to restrict words or phrases of a general import or signification which is well understood and established. If, for example, a term is used in a contract of insurance, of a generic nature, comprehending within its fixed and settled definition several different meanings, each of which is germane to the subject matter of the contract, and descriptive of transactions or events which might arise or occur in the course of the maritime adventures covered by the policy, it would not be consistent with any just rule of exposition to construe such term in a narrow and restricted sense, so as to include one class of its proper definition and to exclude all others. There would in such case be no doubt or ambiguity in the language used, and it would be necessary so to construe it as to give full effect to the term used, to the extent to which it was applicable to the subject matter of the contract. No inference could arise that it was intended by the parties to be used in one sense rather than in another, or that it was not designed to embrace every event or circumstance which in the practical operation of the contract might fairly be included within its meaning.

If we look only at the common and ordinary signification of the word " capture," which it has acquired by general and popular use, there would be no room to doubt that it would include every species of taking by force and violence from without, to which a vessel in the course of a maritime adventure might be exposed. The leading definitions of the word in the dictionaries are, " the act of taking," and " taking by force ; " and in familiar speech " capture by pirates " is a phrase as often used as " capture by an enemy." But in construing legal contracts, especially those of a distinct class, like policies of insurance, in regard to which, owing to the long and constant use of forms substantially alike, as well on the continent of Europe as in England and in this country, there has grown up a common and general use of language and phrases which may be said to constitute *jus et norma loquendi,* it is not always safe to adopt the mere etymological meaning of words, or the definition which lexicographers give to them. It is often necessary to inquire

and ascertain whether a particular word or phrase has acquired a special or peculiar sense or meaning, as applied to the subject matter of the contract, or whether it is used with any restricted signification by authors or jurists or those conversant with the business to which the contract relates. It is in all cases fair to presume that the parties to a policy, in using language, intend to adopt it in that sense in which it is ordinarily taken in framing contracts of insurance. Such is the meaning, it may be supposed, which was present to their minds when they incorporated a word or phrase into their contract.

On turning to elementary treatises on the subject of insurance, it will be found that the most approved of the text writers do not restrict the meaning of the word " capture " so as to limit its signification to the taking of ships or vessels by belligerents engaged in lawful war, nor to their forcible seizure by the acts of governments; but that it is also used by them to signify any unlawful taking by force, by whomsoever the act is accomplished, and that it includes a piratical taking as well as those made *jure belli.* Thus in Marshall on Insurance, (4th edit. by Sergeant Shee,) 394, we find this definition: " Capture is when a ship is subdued and taken by an enemy in open war, or by way of reprisals, or by a pirate, and with intent to deprive the owner of it." He adds: " Capture is deemed lawful when made by a declared enemy, lawfully commissioned, and according to the laws of war; and unlawful, when it is against the rules established by the law of nations. But in general, for every loss occasioned by capture, whether lawful or unlawful, the insurer is liable, the words of the policy being sufficiently comprehensive to include, and a warranty ' free from capture or seizure ' to exclude, every species of capture to which ships at sea can ever be exposed." So in 2 Arnould on Ins. 808, it is said: " Capture is deemed lawful when made by a declared enemy, lawfully commissioned, and according to the laws of war; unlawful when it is made otherwise. But its legality or illegality does not affect the liability of the underwriter as against the assured; whether lawful or unlawful, or however made, capture, when the proximate cause of loss, renders the

underwriter liable under a policy alleging the loss to be by capture." It is true that in a previous paragraph it is stated that capture is a taking by the enemy as prize in time of open war, but the language which follows shows very clearly that, although capture is the appropriate word to designate a lawful taking, and is perhaps oftener used in that sense because such takings are of more frequent occurrence, yet the word as used in its application to the contract of insurance is not always restricted to such meaning. In Phil. Ins. § 1110, it is stated that " the word ' capture ' is of itself broad enough to comprehend any forcible seizure, arrest or detention which may be lawfully insured against." So Chancellor Kent says : " Every species of capture, whether lawful or unlawful, is also a loss within the policy." · 3 Kent Com. (6th ed.) 304. Benecke, 348, in speaking of the causes of abandonment, enumerates capture and detention as being among the leading ones, and adds : " Capture by an enemy or pirate is *prima facie* a total loss." It will also be found that the word " capture," when not used with· reference to the contract of insurance, is applied by legal writers of authority to the taking of vessels by pirates. Abbott on Shipping, (7th ed.) 27. 1 Kent Com. (6th ed.) 108. 2 Wooddes. Lect. 422, (Lect. xxxiv.) And such is the meaning attributed to it in the *St.* of U. S. of 1819, *c.* 77, §§ 2, 3, 4, enacted for the punishment of piracy. 3 U. S. Sts. at Large, 513.

By reference to the writings of foreign jurists and commentators upon the principles of the law of insurance as understood and adopted by commercial communities on the continent of Europe, whence most of the doctrines of our law on the same subject are drawn, some useful illustrations of the meaning of the word " capture " may be obtained. From these we think it manifest that the word *prise* is used in the same sense as capture in our language. It is so translated by Meredith in his edition of Emerigon, *c.* 12, § 18. And we know of no word which more accurately expresses its meaning. It certainly means a taking or seizure by force. But in this sense the word *prise* is by no means used to designate only a lawful taking or seizure in lawful war by belligerents, or by the acts of governments

only. "*Prise maritime.* C'est l'arrestation opérée en mer d'un vaisseau, navire, ou tout autre bâtiment dans le dessein de se l'approprier avec tout ou partie de sa cargaison." 2 Bousq. Dict. de Droit, 496. "La prise est l'acte d'un ennemi, d'un pirate ou autre qui s'empare du navire." Pothier Assur. § 56, *n.* "Les assureurs sont garants non seulement des prises faites par des ennemis ou *des pirates;* mais encore de celles qui sont induement faites par des amis, alliés ou neutres ; en un mot de toutes prises justes ou injustes, faites par hostilités, brigandage ou autrement." Valin Ordon. de la Mar. liv. 3, tit. vi. art. 26. (Vol. 2, p. 76,) citing Casa Regis. *disc.* 1, *n.* 118, and *disc.* 64, *n.* 8 ; Santerna de Assec. part 5, *n.* 8.

A similar doctrine is laid down in Emerigon, *c.* 12, sect. 18, §§ 1, 2. "La prise est lorsqu'on s'empare d'un vaisseau dans le fait de la guerre, ou dans un esprit de déprédation, et avec dessein d'en priver le veritable maître.

"On peut encore distinguer la prise juste, d'avec celle qui est injuste . . . . . La prise injuste est celle qui est faite contre les regles établies par le droit des gens. . . . . . L'assureur est responsable des prises faites par des amis ou par des ennemis non déclarés, tout comme si elles étoient faites par les ennemis propres et déclarés ; car quiconque déprede quelqu'un, est un corsaire, et devient ennemi."

A like statement is made in a more modern treatise : "La prise est le fait de s'emparer d'un vaisseau d'une manière hostile, ou dans un esprit de déprédation. . . . . . Si elle a été juste ou injuste ; suivie ou non d'un jugement : dans tous les cas sans distinction, elle est à la charge de l'assureur." 2 Alauzet des Assur. 33.

These citations, to which others might be added, are sufficient to show that the term "capture" in its legal sense, or as applied to the subject of marine insurance, and the word *prise* in the foreign law, do not merely signify a forcible taking by a belligerent power or by the authority and act of governments, but that they are also appropriately used to designate any unlawful taking ; as well that which is the act of pirates as that which is committed by other persons not duly commissioned

Dole & another *v.* New England Mutual Marine Insurance Company.

by any recognized authority or government. Nor can it be said that such a use of the word is without judicial sanction. In *Goss* v. *Withers*, 2 Burr. 694, 695, Lord Mansfield uses the phrase "capture by a pirate," as distinguished from "capture under a commission." Although some of the *dicta* in this case are incorrect or of doubtful authority, we believe that the accuracy of the expression "capture by a pirate" has never been called in question. So in the modern case of *Powell* v. *Hyde*, 5 El. & Bl. 607, where there was a capture of a ship by Russian soldiers acting without instructions and beyond any authority conferred by their government, it was held that although the capture was without lawful authority, the insurer was not liable, by reason of a warranty in the policy that the vessel was to be "free from capture." Lord Campbell expressly says that "capture in the warranty is not confined to lawful captures, but includes any capture, in consequence whereof the ship is lost to the insured." p. 611. And in *Kleinwort* v. *Shepard*, 1 El. & El. 447 ; S. C. 5 Jur. (N. S.) 863 ; where the question arose whether the taking of a vessel by mutinous coolie passengers was excepted from the risk by a warranty "free from capture or seizure," and it was held to fall within the meaning of the latter word, the counsel for the plaintiff did not contend that the word "capture" is confined to lawful belligerent acts, but admitted that it is properly used to signify a capture by violence from without, "as that of an ordinary enemy, or pirates." In giving the opinion of the court, in answer to a suggestion similar in its nature to one now urged by the plaintiffs, as to the origin of the warranty free from capture and seizure, that it was designed only as a war clause to protect the insurers against the acts of belligerent cruisers, Lord Campbell says that the warranty is not confined to war risks, though often inserted in case of apprehension of war, and that "there is no decision that it must be confined to belligerent seizures ; " and adds : "We clearly think it would extend to a capture or seizure by pirates."

We have extended these citations to an unusual length, in order to make it apparent that in legal nomenclature there is no such limitation on the meaning of the word "capture" as that

which must be given to it in order to charge the underwriters on these policies. It is true that there is no direct decision that a taking by pirates is a capture. Nor is there any to the contrary. Probably the precise question has never before arisen. But we think it cannot be doubted that such an application of the word is not inapt or unusual, but is in conformity to long established and well considered legal phraseology. We do not mean to say that the word is not often used in a different sense. Certainly it is frequently applied to the seizure of vessels by belligerent cruisers, and by persons acting under the authority of governments. But such use only shows that it has a double signification as applied to maritime contracts and adventures, and is no just foundation for an argument in favor of restricting its meaning to one species of taking rather than to another, when there is nothing in the contract or the subject matter to which it relates to indicate any intention by the parties to use it in a special or limited sense. On the contrary, where a word or phrase is inserted in a contract which may be properly said to have two or more meanings, each of which is appropriate and suitable to describe results or events which may in certain contingencies occur or arise in the practical operation of the contract, and which must therefore be presumed to have been in the contemplation of the parties, the true rule of exposition, in the absence of any contrary intent, is to interpret it as having been used by the parties in its fullest and most comprehensive sense.

The authorities which we have cited would well warrant us in holding that the word "capture," as applied to the contract of insurance, is broad enough to include within the exception in the policy a taking by pirates in the most enlarged sense in which that term is used, that is, a taking by common depredators and plunderers, who do not merely make war on the ships or vessels of a particular country, or seek to destroy or take forcible possession of the property only of citizens of any one nation or government, but who commit robbery and pillage upon all persons and property found on the high seas *lucri causâ,* and who may therefore properly be designated as *hostes*

*humani generis.*  But it is not necessary to go to this extent in giving a construction to the warranty in the policies declared on.  On the facts offered in proof at the trial, it cannot be contended that the persons who seized and burned the plaintiffs' ship are to be regarded as pirates within the ordinary signification of that word, as used in the law of nations, or as commonly understood and applied in maritime contracts and adventures. They were not common robbers and plunderers on the high seas.  Although their acts were entirely unlawful, and cannot be justified in the courts of any state recognizing the authority of the constitution of the United States, and although by the laws of congress, which are the supreme law of the land, the persons who committed these acts are liable to be adjudged guilty of piracy and to be punished accordingly, it is nevertheless true that it was offered to be shown in proof, and for the purposes of this discussion it is to be assumed that it could have been proved, that they acted under a semblance of authority, to say the least, which takes their acts out of that class which can be properly termed ordinary piracy.  It is alleged that they sailed under a letter of marque issued by a government *de facto*, claiming to exercise sovereign powers, and to be authorized to clothe their officers and agents with the rights of belligerents, and to send out armed cruisers for the purpose of taking enemy's vessels *jure belli*.  Nor is this all.  It was also offered to be proved that at the time of the loss of the plaintiffs' ship this *de facto* government had proceeded to raise armies and put them into the field, by which an actually existing state of war between it and the government of the United States was created, which had led two of the leading nations of Europe to recognize the persons, who had thus conspired together against the authority of the United States, as exercising the rights and entitled to the privileges of a belligerent power.  It was under an authority derived from these persons that the plaintiffs' ship was taken and destroyed.  In this state of facts, it would be going very far to say that the taking of a vessel by an armed cruiser of such *de facto* government cannot be properly designated as a capture.  Indeed such an interpretation would limit the meaning

of the word, as applied to mercantile contracts, to acts of forcible taking of ships or vessels on the high seas by duly constituted and recognized governments acting according to the laws of war, and would exclude all such acts if unlawful or unjustifiable or contrary to the municipal laws of the country in which the contract was made and to be performed, although done under an authority purporting to come from a government *de facto* engaged in actual war and claiming to exercise belligerent rights. We know of no authority and can see no good reason for putting such a narrow and restricted construction on the words of the warranty.

But it is very strenuously urged by the learned counsel for the plaintiffs that, whatever may be the legitimate signification of the word " capture " in ordinary maritime contracts, it is manifestly intended by the parties in the policies declared on to have a limited meaning, and to be applicable only to belligerent taking or the acts of governments. This argument is based on that clause of the policies by which it is stipulated that " in case of capture or detention, the insured shall not have the right to abandon therefor until proof is exhibited of condemnation, or of the continuance of the detention, (by capture or other arrest,) for at least ninety days;" and it is significantly asked, Can pirates condemn? And can our courts recognize any condemnation within the territory of the United States, without a judicial commission from the president? To which we answer, Certainly not. But these questions do not cover all that is comprehended in the clause relied upon. They would have approached much more nearly to test questions if the clause had stopped at the word condemnation. But it does not. It is put in the alternative, and includes " detention " by capture as well as a change of property by condemnation in a duly constituted prize court, or other recognized judicial tribunal. Now while it is true that capture followed by condemnation can take place only in case of a belligerent taking or capture by the authorized act of agents of a government, it is equally true that capture followed by detention might result from an unlawful or piratical aggression. It seems to us, therefore, that this clause furnishes

no sufficient ground for giving to the warranty free from capture an interpretation which shall confine it to one kind of taking and exclude the other. Nor is this conclusion at all inconsistent with the object which the clause relating to condemnation and detention by capture was designed to accomplish. The manifest purpose of the stipulation was, that in assuming a liability for capture the underwriters did not intend to give up the chance that captors might not be able to procure a condemnation, or that the vessel might escape or be recaptured. In the latter alternative, if the vessel was taken by pirates, the property would remain in the original owners, and there would be no loss under the policy, in like manner as if, in the former alternative, the captors failed to procure a condemnation.

Nor is it to be overlooked in this connection that the clause relating to a loss by capture is unlike that which has reference to a loss by seizure. That stipulation is expressly confined to loss or damage which may arise by seizure "for or on account of illicit or prohibited trade, or trade in articles contraband of war." This stipulation might well be held to limit the word seizure as a cause of loss to a seizure by the authority of governments, because they only can seize property for breach of the laws of trade, or for the transportation of articles contraband of war. Such has been the interpretation of this clause by judicial tribunals. *Johnston* v. *Ludlow*, 1 Caines' Cas. 29, and 2 Johns. Cas. 481. *Carrington* v. *Merchants' Ins. Co.* 8 Pet. 518. It was chiefly on this ground that the case of *Swinnerton* v. *Columbian Ins. Co.*, cited at the argument, was decided by the superior court of the city of New York. The vessel in that case was not taken on the high seas, but was seized under the alleged authority of the state of Virginia, while lying at the wharf in Norfolk. Besides; the stipulation relating to capture in the policy declared on in that case is expressly limited to a loss by capture followed by condemnation, and does not, as in the case at bar, provide for capture followed by detention for a given period. But we have no occasion in the present case to decide on the precise import of the word "seizure" in the warranty.

Dole & another *r*. New England Mutual Marine Insurance Company.

It was suggested in behalf of the plaintiffs that the word "capture," as it stands in the warranty, is to be limited to the same class of risks as those designated by seizure and detention, and that as these latter apply to acts of governments only, the former must have a like construction. But it seems to us that this is not a case where the rule, that words standing together are to be interpreted as signifying things *ejusdem generis*, is applicable. The object of the warranty is to create an exception from the risks enumerated in the policy. The true mode of ascertaining the construction to be given to the words of the warranty is *reddendo singula singulis*, and to apply them to the risks specified, and to hold that they except each risk which may fairly be comprehended within their legitimate meaning. As the risks are clearly not *ejusdem generis*, it is fair to infer that the words creating an exception from them were not designed to apply to one portion of them to the exclusion of another which was aptly designated by one of the terms used.

We have been led by these considerations to the conclusion that, on the facts proved at the trial, the taking of the vessel was a capture in the sense in which that word is used in the warranty, and that the defendants are not liable for a loss thereby occasioned, because it was among the risks which were expressly excepted from the policy.

But it is further contended by the plaintiffs that if this was a case of capture, then the loss under the clause of the policy already cited was not total until condemnation, or the continuance of the detention by capture for at least ninety days, and that within this period the ship was totally lost by fire, and that for this loss the defendants are liable. But the contract of the parties will not support such a construction. The argument overlooks the effect of the exception created by the warranty. A loss by capture was excepted from the risks. When that event happened, the contract of the parties terminated. There is no stipulation in the policy that the insurers were to remain liable after the ship had passed into the hands of her captors. The clause limiting the right to abandon in case of capture

until proof of condemnation, or until the detention has continued ninety days, is intended only to restrict the liability of the underwriter where he assumes the risk of capture, but it cannot be construed as extending his liability to a time subsequent to the capture, where that risk is excepted by the terms of the contract. The cases, therefore, in which it is held that where the insurer is liable for capture if followed by condemnation, or detention for a prescribed period and a subsequent abandonment, he is also liable for any supervening peril occurring during the intermediate period, are not applicable to cases like the present, where the risk of capture is not assumed by the underwriter.

The result is, that the proof offered by the plaintiffs was insufficient to maintain their actions, and according to the agreement of the parties the order must be,

*Cases to stand for trial.*