**THE REPUBLIC OF CHINA, China Merchants Steam Navigation Company, Limited, and The United States of America,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Pennsylvania, and American International Underwriters, Limited. (seven cases).**

**THE S.S. HAI HSUAN.**

**THE S.S. TENG KENG.**

**THE S.S. CHENG KUNG.**

**THE S.S. CHIAO JEN.**

**THE S.S. HUNG CHANG.**

**THE S.S. TSAI ER.**

**THE S.S. LIN SHEN.**
Nos. 3507, 3508, 3510–3514.

United States District Court
D. Maryland, Admiralty Division.
April 29, 1957.

See also, 142 F.Supp. 551.

Kirlin, Campbell & Keating, New York City, and Washington, D. C. (Ronald A. Capone, Washington, D. C., advocate), and Ober, Williams, Grimes & Stinson, Baltimore, Md. (William A. Grimes, Baltimore, Md., advocate), proctors for libelants, The Republic of China and China Merchants Steam Nav. Co., Ltd.

George Cochran Doub, Asst. Atty. Gen., Walter E. Black, Jr., and Leon H. A. Pierson, U. S. Attys., James H. Langrall, Asst. U. S. Atty., Baltimore, Md., Allan Briggs, Atty., Export-Import Bank, and John Beach, Atty., Maritime Admn., Washington, D. C. (Thomas F. McGovern, Admiralty & Shipping Section, Washington, D. C., advocate), proctors for libelant, The United States.

Bigham, Englar, Jones & Houston, New York City (Martin P. Detels and Vincent L. Leibell, Jr., New York City, advocates), and Lord, Whip & Coughlan, Baltimore, Md. (George W. P. Whip, Baltimore, Md., advocate), proctors for respondents.

THOMSEN, Chief Judge.

These suits are brought on (A) marine risk and (B) war risk policies to recover for the loss of seven vessels which had been sold by the United States to the Government of the Republic of China (Nationalist Government), subject to mortgages to secure the unpaid balances of purchase price, and were being operated by the Nationalist Government through China Merchants Steam Navigation Company (CMSN), a government-owned corporation. Most of the masters, officers and crews of the seven vessels defected to the Chinese communist regime in January, 1950, ran up the red flag on their respective ships, and held them for the Communist Government. They had previously disobeyed the orders of the owner of the ships by entering or remaining in a British port and refusing to sail to Taiwan or Japan.

The insurance, i. e., the policies taken together, covered *inter alia* losses due to barratry of the masters or mariners or to the consequences of civil war, but excluded capture and seizure. The principal question in each case is whether the loss was caused by "barratry", or by "seizure", or by both, as those terms are used and understood in the marine insurance field. The parties are agreed that none of the vessels was "captured".

Libelants contend that the losses were caused by a series of barratrous acts, which were committed for various economic and other personal reasons, or, in the alternative, as a consequence of the civil war in China; that the term "seizure" as used in marine insurance policies, does not include the defection of the master or of the mariners, but requires proof of force, used or threatened, by the armed services or representatives of some government. Alternatively, libelants contend that if both barratry and seizure were causes of the loss, recovery may be based on barratry.

Respondents contend that the losses were not caused by barratry, but by seizure of the vessels; that a loss caused by seizure was excluded from coverage, even though barratrous acts preceded the seizure and might also be considered a proximate cause of the loss. Respondents also contend that libelants did not do all they were required to do under the sue and labor clause in the policies, and that the United States should have accepted an alleged offer to pay off the mortgage on one of the ships.

## Facts

I have made and filed findings of facts based upon nearly 300 proposed findings submitted by libelants and by respondents. The following narrative statement, supplemented by additional facts set out in the discussion of the several points of law, sets out the essential facts.

## Historical Background

The Republic of China was proclaimed in 1911. For more than a decade thereafter, war lords controlled many of the provinces, but during the middle 1920's the Kuomintang, under the leadership of Chiang Kai-shek, established a strong national government at Nanking. Following World War II, Taiwan (Formosa), long a part of the Chinese empire, but surrendered to Japan after the Sino-Japanese war in 1904, was reincorporated into China as a province.

The Chinese communist movement was relatively unimportant until 1937, when it became active in organizing resistance to Japan . in northern China. After World War II, communist armies dominated the countryside as far south as the Yangtse, although Peiping, Shanghai and Nanking remained in the control of the Nationalist Government, as well as most of southern China. The communist regime claimed to exercise governmental authority over northern China. Early in 1949, the communist armies started driving southward, and as of April 19, 1949, a state of civil war existed. The Nationalist Government, under increasing pressure from communist forces, moved its capital from Nanking to Canton in April, 1949; thence it moved to Chungking in October, to Chengtu in November, and to Taipei, Taiwan, on December 9, 1949. By that time nearly the whole mainland of China was under the control of communist forces, acting for the rival de facto government, which on October 1, 1949, had proclaimed itself the government of China under the name of the Central People's Government of the People's Republic of China, and had purported by decree to dismiss the ministers of the Nationalist Government and to appoint new ones.

The United States has never recognized the Communist Government as a de jure government, but continues to recognize the Nationalist Government, which is a member of the United Nations, as the only de jure government of China.

As of midnight January 5/6, 1950, the British Government recognized the Communist Government as the de jure government of China. At the same time, it ceased to recognize the Nationalist Government as a de jure government. Following the action by the United Kingdom, a number of other European and Asiatic nations extended de jure recognition to the Communist Government.

Sale and Hypothecation of the Vessels

On various dates during 1946 and 1947, the United States sold to "the Government of the Republic of China" a number of vessels, including the seven involved in these suits. At the same time, the Government of the Republic of China executed and delivered to the United States, represented by the Maritime Commission (Maritime) in certain instances, the Export-Import Bank of Washington (Eximbank) in others, a note and a preferred ship mortgage or hypothecation to secure deferred payments of the purchase price of each vessel. Under the terms of the mortgages, security title was vested in the United States. Events of default occurred in October, 1949, and the mortgages were declared in default by Maritime and Ex-

imbank on or about January 17, 1950; this action gave the United States the right to retake the said vessels.

As of December 31, 1956, the balances due on the several notes, with interest, were as follows:

| Ship | Outstanding Balance of Principal | Total Interest (3½% to date default declared, 6% thereafter) | Total Principal & Interest |
|---|---|---|---|
| Eximbank | | | |
| Lin Shen | $416,100.00 | $185,329.80 | $601,429.80 |
| Teng Keng | $390,640.00 | $173,989.99 | $564,629.99 |
| Tsai Er | $390,640.00 | $173,989.99 | $564,629.99 |
| Maritime | | | |
| Cheng Kung | $313,200.00 | $138,110.72 | $451,310.72 |
| Chiao Jen | $313,200.00 | $138,553.75 | $451,753.75 |
| Hung Chang | $313,200.00 | $137,890.67 | $451,090.67 |
| Hai Hsuan | $373,880.00 | $165,737.29 | $539,537.29 |

### CMSN

Until September, 1948, the vessels were operated by an agency of the Nationalist Government. In that month the agency was reorganized into a limited stock company and was renamed "China Merchants Steam Navigation Company, Ltd." (CMSN). At all material times, CMSN was and is owned by the Government of the Republic of China (the Nationalist Government), and has functioned as an agency or organ of that government under the control and supervision of the Ministry of Communications. Shoreside personnel, as well as the masters, officers and crews of CMSN, are considered public functionaries under Chinese law.

Prior to May, 1949, the head office of CMSN was located at Shanghai. By government order, it was then transferred to Taipei, Taiwan. All CMSN employees knew of the transfer. W. H. T. Wei was General Manager of CMSN, and had his office in Taipei.

Until January 13, 1950, CMSN maintained a branch office in Hong Kong. Its marine superintendent also had his office there. The trading department of CMSN was located at Canton until October, 1948, when Tsao Sin-Tse, the head of the trading department, moved that office and most of his staff to Hong Kong.

In 1946 and 1947, when the vessels were acquired from the United States, they were registered at the Port of Shanghai. After the transfer of the head office of CMSN to Taipei, the port of registry of each of the vessels was transferred to a port in Taiwan. These transfers were made between July and November, 1949.

### The Policies

The insurer under all of the policies was National Union Fire Insurance Company of Pittsburgh. American International Underwriters, Ltd., and its associated and affiliated companies, referred to herein collectively as AIU, acted as underwriting and claims agent for the insurer in these and other cases. Respondents knew that the head office of CMSN had been transferred to Taipei and knew that CMSN was operating the ships as an agency or organ of the Nationalist Government. Respondents dealt with it as such. Before and after October 1, 1949, and after January 5, 1950, premiums on the policies in question were paid to respondents out of the funds of the Nationalist Government.

The named insured in all of the policies was "The Government of the Republic of China represented by Universal Trading Corp.". On the policies covering the ships hypothecated to Maritime a typed

clause reads: "Loss, if any, payable in the currency of the United States to the United States Maritime Commission for distribution by it to itself and the Government of the Republic of China represented by Universal Trading Corporation, as their interests may appear, or order." A similar clause appears on the Eximbank policies.

The total amounts for which the several vessels were insured were: Cheng Kung, $470,000; Chiao Jen, $470,000; Hung Chang, $470,000; Lin Shen, $342,375; Teng Keng, $372,075; Tsai Er, $342,375; and Hai Hsuan, $550,000. The policies were valued policies.

The policies insuring against marine risks contain the traditional "perils clause", insuring against "Perils * * * of the Seas, * * * Enemies, Pirates * * * Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes * * * excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the Policy or by endorsement." The f. c. & s. clause (so called because of the important words: "Free of Capture and Seizure") excluded claims for loss, damage or expenses "resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise; whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations * * * Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy."

In the policies insuring against war risks the principal insuring clause reads as follows: "It is agreed that this insurance covers only those risks which would be covered by the attached [marine risk] policy (including the Collision Clause) in the absence of the F.C. & S. warranty contained therein but which

are excluded by that warranty" (Brackets supplied). Then follows a series of warranties and additional clauses, which provide, *inter alia*, that the war risk policies cover "the risks of * * * civil war, revolution, rebellion or insurrection or civil strife arising therefrom * * *", but do not cover "any claim for delay or demurrage". Each war risk policy contains a typewritten clause: "Excluding Capture and Seizure".

The marine risk and war risk policies are, by their express terms, mutually exclusive; to recover under the war risk policy it must be shown that the loss is one covered by the perils clause of the marine risk policy but excluded therefrom by the f.c. & s. warranty. The policies are complementary, and were placed with the same insurer in order to obtain full coverage, except for the items specifically excluded, and to avoid the troublesome questions that arise so often when the two policies are issued by different insurers.

The printed "perils clause", on the face of each policy, contains the customary statement: "And it is agreed that this Writing or Policy of Insurance shall be of as much Force and Virtue as the surest Writing or Policy of Insurance made in London." But the attached form identified as American Institute Time (Hulls) contains the New York Average Adjustment clause, which adopts the Laws and Usages of the Port of New York for certain purposes.

The clauses attached to the policy are "American Institute" clauses, prepared by the American Institute of Marine Underwriters, not those prepared by the London Institute of Marine Underwriters. See Dover, Analysis of Marine and Other Insurance Clauses, London, 1950.

A rider contains three clauses known as Maritime Commission clauses and one known as the New York Suit Clause. That clause provides that if the vessel "is insured with Underwriters not doing business in the United States the following clause shall apply:—The place of physical and actual issue and delivery of this policy is the City of London.

Nevertheless, at the option of the Assured, as between the Assured and the Assurers, the place of issue and delivery of the policy shall be considered the City of New York and all matters arising hereunder shall be determined in accordance with American Law and practice. Any suit hereon may be brought against these Assurers in any court in the State of New York. * * * For the purpose of suit as herein provided, the word 'Assured' includes any mortgagee under a ship mortgage and any person succeeding to the rights of any such mortgagee."

Since the insurer, National Union Fire Insurance Company, is doing business in the United States, that clause does not apply. The evidence does not show why it was included, or why the parties might have wished that New York law should apply if the insurer *is not* doing business in the United States, but that British law should apply if the insurer *is* doing business in the United States.

All of the policies were executed in Bermuda, a British possession, following negotiations in New York between Johnson & Higgins, brokers for the assured, and AIU, agents for the insurer. There were no negotiations in Bermuda. Binders were first prepared by AIU in New York, executed in Bermuda and mailed to Johnson & Higgins, brokers for the assured. Thereafter AIU prepared the policies in New York and sent them to Bermuda, where they were signed by a British national and mailed back to Johnson & Higgins, who sent them on to Maritime and Eximbank, where they were reviewed by the insurance experts of those agencies.

As originally written, the war risk policies did not exclude capture and seizure. They have always contained trading warranties, which were modified from time to time. At one time the trading warranty read: "Warranted no voyage to ports in China not in control of the Government of the Republic of China". Later they read: "worldwide excluding the Baltic Sea, Black Sea and China north of Amoy, or held covered at additional premium to be arranged". On January 17, 1950, the warranty was changed to read: "worldwide excluding China other than Hong Kong, Formosa and Macao or held covered at additional premium to be arranged." This clause remained on the policies then in effect until they expired in April, 1950. In June, 1949, the clause "excluding capture and seizure" was added to the war risk policies.

At various times, there were discussions whether the war risk policies should be rewritten to cover only the risk of physical loss and damage to the vessels. The rate for such protection would have been lower than the rate for the policies as they stood in January, 1950, with the clause "excluding capture and seizure".

### The Six Hong Kong Vessels

During most of November and December, 1949, and January, 1950, thirteen vessels owned by the Nationalist Government and operated by CMSN were in or sailed into the port of Hong Kong. Among them were six of the vessels which are the subject of this litigation. The Cheng Kung, Chiao Jen, Hung Chang, Lin Shen, and Tsai Er arrived in Hong Kong on various dates from July 31, 1949, to December 15, 1949, and remained there continuously until September, 1950. The Teng Keng arrived in Hong Kong on November 26, 1949, left for Bangkok on December 14, 1949, and arrived back in Hong Kong on January 3, 1950, with cargo and mail from Bangkok for Hong Kong. These six vessels will be referred to collectively as the Hong Kong vessels.

During November, December and January, the general manager of CMSN was W. H. T. Wei. His office was in Taipei, Taiwan, and he has at all times remained loyal to the Nationalist Government. Tong Tsuan-chi was manager of the Hong Kong branch office. Tsao Tsin-See, assistant general manager of the company and head of the trading department, was also in Hong Kong and was in constant communication with Wei.

The marine superintendent, Chen Tien-tsing, had given indications of disloyalty, but until the early part of January, 1950, Manager Tong and most of the personnel attached to the Hong Kong office were ostensibly loyal, and made some effort to carry out the orders received from the head office of CMSN in Taipei. However, on or about January 13, 1950, Manager Tong and most of the other employees at Hong Kong defected to the communist regime and published an advertisement in a Hong Kong newspaper on January 13, 1950, stating that they had done so. Tsao, who was a personal friend of Wei, apparently remained loyal, but his testimony left me with the impression that he sat rather firmly on the fence during the latter part of the critical period.

From November 13, 1949, until January 16, 1950, General Manager Wei sent many messages to Tsao, to Tong, to the masters and to the officers and crews of the ships at Hong Kong, ordering the masters, officers and crews to sail the vessels out of Hong Kong and either return to Taiwan or sail to Japan. A choice of sailing to the Phillipines was offered in certain instances. During this period, there were innumerable discussions among the masters, officers and crews, respectively, and between representatives of the several groups; separate meetings of masters, deck officers, radio operators, pursers, and others were held in various restaurants in Hong Kong during December and early January. These meetings proceeded in typical Chinese fashion, with no vote, but a clear sense at the end of each meeting that most of those present were opposed to sailing to Taiwan or Japan, and were in favor of declaring allegiance to the communist regime at the appropriate time.

It does not appear that the masters, officers or crews of the ships, or the employees of the Hong Kong office of CMSN, had any real loyalty to either the Nationalist or the Communist Government, although some men in each class had a feeling of loyalty to one or more of their superior officers. There is direct evidence that there were communist agents operating in Hong Kong, and I infer that there were communist agents on the ships and agents of the Nationalist Government both on the ships and in Hong Kong. The masters, officers and crews were reluctant to go to Taiwan and wished to remain in Hong Kong for the following reasons: (1) they were afraid their ships might be requisitioned by the military authorities on Taiwan; (2) they feared that if they went to Taiwan they would not be allowed to leave, but if they remained in Hong Kong they might be able to operate their vessels to ports in Southeast Asia and earn better pay; (3) the families of many of the men were living in Shanghai or other areas on the mainland under the control of the Chinese communists, and they were afraid that if they went to Taiwan, their families might suffer at the hands of the communists, or that they would not be able to send money to their families; (4) it was reported that the cost of living on Taiwan was very high and the living conditions very bad; (5) they wanted to remain in Hong Kong to see what the British were going to do; (6) they believed that Taiwan would soon fall into the hands of the communist regime; (7) they objected to the inter-guarantee orders of the Nationalist Government on Taiwan, which required that the behaviour of each person coming to Taiwan be vouched for or guaranteed by other persons; and (8) the younger men were afraid that they would be drafted into military service.

The various masters and officers reported these attitudes to Tsao and to Tong. Tsao passed the reports on to Wei. Tong sent requests for additional money for wages and supplies, and made various excuses why the ships could not sail. The necessary money was sent to Hong Kong, and I find that there was no reason why the ships could not have sailed except the unwillingness of the masters and mariners to obey the orders. Two ships, not involved in these suits, did sail to Taiwan. The head office at

Taipei sent messages to the men agreeing to eliminate the inter-guarantee orders, promising not to enroll them in the military forces, and promising additional bonuses if the men returned to Taiwan. Nevertheless, the masters and most of the members of the crews remained unwilling to leave Hong Kong.

On January 10, 1950, the South China Morning Post, published in Hong Kong, carried a story under a San Francisco, January 9, dateline which said: "Premier Chou En-lai of the Central People's Government issued an order of the day to-day, instructing all personnel of political, diplomatic, financial, economic * * * organs of the former Kuomintang Central and Local government in Hong Kong to safeguard State property and archives, await the taking-over, and must not allow reactionary elements to steal, destroy, remove and conceal them." Chou promised rewards for those who safeguarded state property and punishment for those who stole, destroyed, removed or concealed it. The Communist Government took over all government property on the mainland that it could reach; but neither the Common Program nor the statements of Organic Law issued on September 29, 1949, nor any other proclamation or document issued before March 18, 1950, purported to take over either CMSN or any ships in foreign ports. A declaration of the Ministry of Communications of the Communist Government dated March 18, 1950, set out in a newspaper release is quoted below under the heading "Sue and Labor —Hai Hsuan", and is discussed in Section III B of the Conclusions of Law.

The personnel of the Hong Kong office, who defected on January 13, 1950, continued to man the office; but they displayed the communist flag, and it is impossible to tell from the evidence whether they maintained the office on behalf of CMSN as a purported agency of the Communist Government, or on behalf of a new corporation or agency which had been or was shortly thereafter created by the Communist Government. It is clear that it was being operated for the benefit of the communist regime.

The recognition of the Communist Government by the British Government on January 5, 1950, made it clear that the masters, officers and crews could stay in the port of Hong Kong without fear of punishment by anyone. On the evening of January 15, Tso Wen-yuan, master of the Tsai Er, accompanied by three or four officers of other vessels, distributed flags of the Communist Government to the masters of the other ships. On January 16, the master of each ship raised the flag of the Communist Government in place of the flag of the Nationalist Government. Some of the crew on one or more of the ships were "disgusted" by the change of flag, but no opposition of any sort was offered, and no show of force or threat of violence was employed by the masters or by anyone else. The personnel of the Hong Kong office, having already defected, purported to give orders that the flags be changed; but it is clear that Captain Tso of the Tsai Er was a ringleader in the conspiracy, and that the masters of all six vessels changed the flags voluntarily as a result of an agreement previously reached among themselves. The decision of each master to defect to the communist regime and to change the flag was his own deliberate decision, made for some or all of the reasons outlined above, and induced in varying degrees by arguments and pressures employed and exerted by communist agents.

The vessels remained in the port of Hong Kong until September, 1950, when they sailed for Canton. During that time wages were paid by the Hong Kong branch office with money supplied by the communist regime. However, at no time while the vessels were in the port of Hong Kong was any document or other paper filed with the government of Hong Kong showing any change in the port of registry, owner or flag of any of the six vessels.

### The Hai Hsuan

About December 22, 1949, the Hai Hsuan, flying the Chinese Nationalist

flag, left Cabo de Gato, Spain, via the Suez Canal, for Japan, with a cargo of salt for the account of SCAP, which was being carried under the terms of a charter party. The master of the vessel was Pang-siang Hsueh and the chief officer was Yang Soon-Ee. On January 5 or 6, 1950, at Port Aden, the Hai Hsuan took on enough fresh water and oil to enable her to sail directly to Japan without stopping at intermediate ports. About January 7, 1950, the officers and crew heard on a BBC broadcast that the British Government had recognized the Chinese communist regime, and on January 16 heard that the Hong Kong branch office of CMSN and thirteen ships had defected. In the meantime, Captain Hsueh had received a message from the head office of CMSN, instructing him not to stop at Hong Kong. A few days later he received other messages from the head office, instructing him not to call at any British port.

At about the same time, the chief engineer, chief officer, and some of the other officers told the captain that the officers and crew wanted to go to Hong Kong to take advantage of the cheap prices there and to transmit money to their families in Shanghai. The captain tried to persuade the officers and the crew not to disobey his orders and the orders of the owners, and assured them that they could go back to their families in Shanghai after the vessel reached Taiwan. The chief engineer, who had been urging the officers and crew not to go to Taiwan, used a slight illness of the chief fireman as a pretext for insisting that they stop at Singapore. The captain then sent an equivocal message to the head office, because he believed that the officers and crew would not permit him to send a message telling the head office of the trouble which was brewing aboard the vessel.

On January 19, the Hai Hsuan received a message from the Hong Kong office of CMSN, purporting to order the vessel into Singapore to await further orders. The captain told the radio operator that the Hong Kong office had de-fected to the Communist Government and that the message had no value. Shortly thereafter, the head office of CMSN sent another message, instructing the vessel to accelerate speed and sail for Taiwan. This message was transmitted to the crew. On the same day the officers and crew held a meeting to decide which orders they should obey. The captain told the meeting that they should obey his orders and left the room.

On January 22, the chief officer told the captain that if he did not call at Singapore the engine room would probably stop the engines. That night, when the vessel was about one hundred miles west of Singapore, the captain left orders to proceed past Singapore without stopping. The following morning, when the vessel was about thirty miles west of Singapore, the engine room stopped the engine and turned off the telemotor. The captain ordered the anchor dropped to avoid possible danger to the vessel. He had had no food for several days and was sick with fear.

On January 23, he radioed the head office, stating that he was sick in bed and asking instructions. In reply to this radiogram, and with no knowledge of what had been transpiring on the ship, General Manager Wei directed that the chief officer take over as master and sail for Taiwan. In the meantime, the chief officer, chief engineer, and chief purser had demanded that the captain bring the ship into Singapore. The captain refused to do so and reminded them of the orders from the head office not to sail to Singapore or any other British port. The chief officer then stated that he would take the ship into Singapore. He did so on January 24. The same day Captain Hsueh left the Hai Hsuan and was admitted to Singapore General Hospital, where he remained for nearly a month.

On January 26, the flag of the Government of the Republic of China on the Hai Hsuan was replaced by a Chinese Communist flag, provided by some communist agent or sympathizer at Singapore. Thereafter, the wages of the of-

ficers and crew were paid by the Hong Kong office of CMSN on behalf of the Communist Government. The captain's back pay was sent to him at the hospital. As soon as he arrived at the hospital Captain Hsueh sent several messages to the home office, requesting assistance; he stated that he had done all he could but had been ousted.

### Sue and Labor—Hai Hsuan

The head office of CMSN notified the Ministry of Communications and the American Consul General in Taipei of what had happened, and requested the United States Navy to take back the Hai Hsuan if she should come out of Singapore. K. Y. Pao, the representative of the Ministry and of CMSN in Washington, also asked the United States for assistance in regaining possession of the ship.

About February 1, Paul H. Paulsen, a qualified master, was instructed to proceed to Singapore and take command of the vessel. Upon arriving at Singapore, he attempted to obtain police protection for his efforts to recover the ship. He was refused such protection, and was told that it would be the duty of the British CID to furnish protection to the officers and crew then in possession of the vessel. Nevertheless, he recruited a skeleton crew and, unarmed, boarded the Hai Hsuan and tried to persuade the officer in charge to turn her over to him. His request was put to a vote of the officers and crew aboard, who refused his demand. He finally left the Hai Hsuan because the crew was becoming belligerent. A few days later, acting on instructions from the State Department, the American Consul General at Singapore, accompanied by two of his staff, approached the Hai Hsuan by launch, showed the officer on duty the hypothecation held by the United States on the vessel, and demanded that she be turned over to him as the representative of the United States. He was refused permission to board the Hai Hsuan and was referred to the chief officers, who were then ashore. He made numerous efforts to get in touch with the officers, but was unsuccessful.

The Consulate also retained solicitors in Singapore, to advise the United States and to institute appropriate legal action to recover possession of the Hai Hsuan. On February 23, 1950, the United States brought suit against the acting captain and third officer of the Hai Hsuan in the High Court of the Colony of Singapore, in an effort to obtain possession of the vessel because of default in the mortgage payments. On March 28, the High Court refused to exercise jurisdiction, stating that the Communist Government claimed the ship, and its sovereign immunity deprived the British Court of jurisdiction. United States v. Yang Soon-Ee & Another, (1950) 1 Malayan Law Report 63.

On March 19, 1950, the Peiping People's Daily carried a report from the official news agency of the Communist Government, stating: "Most recently the SS HAI HSUAN staged a righteous uprising and sailed into Singapore and those ships in Hong Kong which also staged a righteous uprising, as well as all the ships which are now in foreign ports which originally belonged to the bogus Koumintang Government or owned by the Chinese bureaucratic capitalists, should become the property of the People's Republic of China and be under the direct control of the Ministry of Communications of the Central People's Government. Only our Central People's Government and person or persons duly authorized by the Central People's Government have the right to dispose of these ships. It cannot be permitted for any person, by whatever means, to trespass, damage, detain, transfer or to interfere with their movements. This holy property right of our Central People's Government should be respected by the Governments of Singapore, Hong Kong, or any state. If any of these ships in Singapore, Hong Kong or in the port of any state were to suffer any trespass, damage, detention, transference or any intervention of movements, such government must bear the full re-

sponsibility and the consequences arising therefrom. Be this so declared."

The Chinese language has no tense; it very often has no conjugation; one says "Yesterday I go", "Today I go", "Tomorrow I go". All translations must be read with these facts in mind. The statement of March 19 should be construed as a purported retroactive declaration of property rights, intended to influence the decision of the Singapore court.

#### Sue and Labor—Hong Kong Vessels

Immediately after the defection of the masters in Hong Kong and the change of flag, the Government of the Republic of China, CMSN and the United States took steps to recover possession of the vessels. Agents were sent from Taipei to talk to the seamen and to try to persuade them to sail to Taiwan. An abortive effort was made by a few loyal seamen to obtain control of one of the vessels, but after that effort failed it was evident that no such attempt could succeed.

The United States declared the mortgages in default; the American Consul General at Hong Kong requested the British authorities to prevent the vessels from sailing, and retained solicitors to advise the United States and to institute legal proceedings to recover possession of the vessels. The Naval Attaché in Hong Kong requested the assistance of the Royal Navy to recover the vessels for the United States, but the Royal Navy refused to intervene. British authorities in Hong Kong advised the Americans that they had found no way of preventing the vessels from sailing out of Hong Kong. Counsel for Chinese libelants and for the United States, both in Hong Kong and in Washington, advised libelants that neither the Government of the Republic of China nor CMSN nor the United States could succeed in a legal action in the courts of Hong Kong, because the ships were being held by their masters on behalf of the Communist Government. This opinion was confirmed by the decision of the Singa-

pore court in United States v. Yang Soon-Ee, supra, and the decisions of the Hong Kong courts in the airplane case, Civil Air Transport, Inc. v. Chennault et al., 34 Hong Kong L.R. 358, 34 Hong Kong L.R. 386.

The United States also considered the possibility of recovering possession of the vessels in Hong Kong by forcible seizure, but concluded that such an attempt would be futile.

#### Sue and Labor—All Vessels

The American Embassy in London requested the British Government to issue an Order in Council declaring that it should not be a bar to the jurisdiction of the Singapore or Hong Kong courts that a suit involving the vessels would in effect implead a foreign sovereign state. Such an Order in Council had been issued on May 10, 1950, in connection with seventy aircraft at Hong Kong which had been sold in December, 1949, by the Nationalist Government to General Chennault and others, but which were being claimed by the Communist Government. See Civil Air Transport, Inc. v. Central Air Transport Corp. (1953) A.C. 70 (1952) 2 Lloyd's Reports 259. There was little or no precedent for the order in the airplane case, and on August 17, 1950, the British Government refused to issue such an order with respect to the ships. A second, more formal request was presented to the British Government on September 12, 1950; it was formally denied on November 24, 1950. For a fuller statement of the facts in connection therewith, see my opinion filed in these cases on July 9, 1956, 142 F.Supp. 551.

During the period November 13, 1949, to September, 1950, libelants incurred expenses in the minimum amount of $1,-585.44 in suing and laboring and otherwise attempting to prevent the loss and to recover possession of the Cheng Kung, Chiao Jen, Lin Shen, Hung Chang, Teng Keng and Tsai Er. The corresponding figure for the Hai Hsuan is difficult to determine with exactness, but was at least $2,000.

Abandonment and Proofs of Claim

Early in April, 1950, after consulting counsel in Hong Kong, Singapore and Washington, libelants concluded that there was no reasonable possibility of recovering possession of the vessels in the foreseeable future, and that they were totally lost to libelants. Thereupon, by letters dated April 12, 1950, and April 13, 1950, libelants jointly notified respondents of the loss of the seven vessels, abandoned to respondents all of their right, title and interest therein, and claimed the full amounts for which the several vessels were insured. Respondents refused to accept abandonment of the vessels and disclaimed liability under the insurance policies. Proper proofs of loss and other necessary documents were filed.

The claim in each case is for a constructive total loss of the ship, alleged to have occurred in January, 1950. Respondents concede that there was a constructive total loss of each ship on the respective dates in January, 1950, on which the flags were changed.

Conclusions of Law

Arnould on Marine Insurance, 14th Ed., by Lord Chorley of Kendal, 1954, the leading authority on the subject, will be frequently cited. I will not list the British cases cited by Arnould in the sections to which I refer, although I have read most of them and have read all those cited by counsel.

I. What Law Governs

■■ All negotiations leading up to the issuance of the policies were conducted in New York. For some reason not shown by the evidence the policies were prepared by AIU in New York and sent to Bermuda for execution there by an authorized representative of AIU, who then mailed the policies to insured's broker. The place of contracting was, therefore, Bermuda. Restatement, Conflict of Laws, sec. 319. The place of performance was New York. Any loss is payable there, in dollars, to the United States Maritime Commission, for distribution. The hour of attachment and

termination of the risk was stated in E.S.T. The clauses attached to the policy are "American Institute" clauses; but none of the confusing and conflicting clauses provides specifically what law shall govern these cases.

■ The general rule is that the law of the place of contracting governs the validity of the contract, the nature of the obligation and the duty to render the performance for which the insurer became bound. Restatement, Conflict of Laws, sec. 332, comment c; sec. 346. But matters concerning performance are determined by the law of the place of performance. Restatement, Conflict of Laws, sec. 332, comment c; sec. 358, comment b. In Marine Ins. Co. v. Mc-Lanahan, 4 Cir., 290 F. 685, the policies were issued in England and the premiums were paid in pounds in London, but the subject matter insured, an American barge, was valued in dollars, its trading space was limited to waters adjacent to the United States, the hour of attachment and the ending of the risk were calculated according to New York time, and payment of any loss was to be made in America. The court held that the policies had to be construed by the laws of the United States and not by the laws of Great Britain, if they differed in any particular. See also Calmar S. S. Corp. v. Scott, 2 Cir., 209 F.2d 852, 856. However, the rules for ascertaining the meaning of the words of a contract are not a question of conflict of laws at all. Restatement, Conflict of Laws, sec. 332, comment a.

Libelants contend that American law controls the case, respondents, British law. But both sides have shifted their position from time to time. For example, libelants urge the court to follow certain English authorities on the question of proximate cause in barratry cases, and refer, in their brief, to "these English policies" and to "English underwriters", evidently meaning the Bermuda affiliate of AIU which signed the policies as agent of National Union Fire Insurance Co., and the British underwriters who reinsured at least 80% of

each policy. Respondents, in a recent brief, object to these references and say: "The policies in suit are underwritten by an American insurance company and F. C. & S. clauses are 'American Institute' clauses, as are the clauses providing coverage against war-risks." In their final brief, respondents state that they "do not perceive any difference between American law and English law on any issue in these cases".

Indeed, the conflict of laws problem is more apparent than real. "The important thing is to secure uniformity of view in a commercial world, which now embraces and long has included more than one continent and more than one ocean." Queen Ins. Co. of America v. Globe, etc., Co., D.C.S.D.N.Y., 278 F. 770, 781, affirmed 2 Cir., 282 F. 976, and 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402. The Supreme Court referred to the "special reasons for keeping in harmony with the marine insurance laws of England * * *." 263 U.S. 487, 493, 44 S.Ct. 175, 177. More recently the Supreme Court has stated: "It is true that we and other American courts have emphasized the desirability of uniformity in decisions here and in England in interpretation and enforcement of marine insurance contracts. Especially is uniformity desirable where, as here, the particular form of words employed originated in England. But this does not mean that American courts must follow House of Lords' decisions automatically. Actually our practice is no more than to accord respect to established doctrines of English maritime law." Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 59, 71 S.Ct. 135, 138, 95 L.Ed. 68. Applying these principles, I have considered precedents from both sides of the Atlantic.

## II. Canons of Construction

■ The "conglomerate provisions" which comprise the typical marine insurance policy were discussed by the Supreme Court in Calmar S. S. Corp. v. Scott, 345 U.S. 427, 431, et seq., 73 S.Ct. 739, 97 L.Ed. 1125. The policies to be construed in the instant suits have accumulated their full share of conflicting, confusing and ambiguous clauses. The canon *contra proferentem* applies; Marine Ins. Co. v. McLanahan, 4 Cir., 290 F. 685, 688; Calmar S. S. Corp. v. Scott, 2 Cir., 209 F.2d 852, 856; Arnould, sec. 74; and applies here against the insurer. But it is a last resort; we must first try to discover what the parties intended the policies to mean. Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, at page 57, 71 S.Ct. 135, 95 L.Ed. 68; Dole v. New England Mutual Marine Ins. Co., 6 Allen 373, 88 Mass. 373, 385. The intention is to be gathered from the writing, taken as a whole. Words are to be given their plain and ordinary meaning unless from the context (a) of the document, or (b) of the transaction, it appears that the words were used in some other sense. Business and insurance practices are to be considered. Arnould, secs. 55, 56, 63 to 71, incl.; Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 60, 71 S.Ct. 135, 95 L.Ed. 68; Greene v. Pacific Mutual Ins. Co., 9 Allen 217, 91 Mass. 217, at page 219; Dole v. New England Mutual Marine Ins. Co., 6 Allen 373, 88 Mass. 373.

■ The negotiations leading up to the issuance of the policies were conducted by an experienced marine insurance broker on behalf of the assured, and after delivery the policies were checked by the insurance experts of Maritime and Eximbank. The language of the policies, therefore, should be construed (a) in the context of a marine insurance policy, and (b) in the context of the series of transactions which caused the policies to be issued and modified from time to time. Since the transactions and negotiations occurred in the United States, this court should determine what the words and expressions used would mean to a marine insurance broker or underwriter in the United States. A British court would do the same.

## III. Barratry

■ *A. In General.* The classic definition of barratry was given by Lord

Ellenborough, C. J., in Earle v. Rowcroft, 8 East 126, at 138: "* * * a fraudulent breach of duty by the master, in respect to his owners; or, in other words, a breach of duty in respect to his owners, with a criminal intent, or ex maleficio, is barratry. And with respect to the owner of the ship or goods, whose interest is to be protected by the policy, it can make no difference in the reason of the thing, whether the prejudice he suffers be owing to an act of the master, induced by motives of advantage to himself, malice to the owner, or a disregard to those laws which it was the master's duty to obey, and which (or it would not be barratry) his owners relied upon his observing." The English Marine Insurance Act, 1906, Sch. I, Rule 11, provides: "The term 'barratry' includes every wrongful act wilfully committed by the master or crew to the prejudice of the owner, or, as the case may be, the charterer." This definition is accepted in America as well as in England. Arnould, sec. 839; 1 Phillips on Insurance (5th ed., N.Y., 1867), sec. 1062; Patapsco Ins. Co. v. Coulter, 3 Pet. 222, 28 U.S. 222, 7 L.Ed. 659; Greene v. Pacific Mutual Ins. Co., 9 Allen 217, 91 Mass. 217. Wilful nonfeasance of the master, doing nothing, if productive of mischief to the owner, may be barratry. Patapsco Ins. Co. v. Coulter, supra. If the captain deviates, or is compelled by the crew to deviate the vessel from its proper course and to put into an unauthorized port in fraud of his or their duty to owners, it is barratry. So is unreasonable or criminal delay. Arnould, secs. 844, 847. Where a captain, acting in collusion with the captain of an enemy ship, sailed his vessel to an area where she was captured by the enemy ship, it was held that recovery might be had either on the ground of barratry or of capture. Arcangelo v. Thompson, 2 Camp. 620. Crime is not a necessary element of barratry. Arnould, sec. 845, 847. Mutiny of mariners is discussed in Arnould, sec. 848, which says that "where the crew overpower the captain or constrain him to consent to their proceedings, the same acts would be barratry in them as in the master."

In the instant suits, the masters and many of the mariners of the six Hong Kong vessels were guilty of barratry in December, 1949, and January, 1950, in failing or refusing to sail to Taiwan or Japan as ordered by General Manager Wei. With respect to the Teng Keng, these barratrous acts occurred only after she returned to Hong Kong from Bangkok on or about January 3, 1950. Finally, the six masters were guilty of barratry in running up the red flag and holding the ships for the Communist Government. These barratrous acts, which had the approval of most of the officers and crew of each ship, caused the constructive total loss of the vessels, which all parties now agree occurred in January, 1950.

Many of the officers and crew of the Hai Hsuan were guilty of barratry in refusing to sail to Taiwan, stopping the engines in Singapore Straits, threatening Captain Hsueh, sailing into Singapore harbor in violation of the orders given to the master by the owner and transmitted by him to the mariners, running up the red flag, and refusing to turn the ship over to Captain Paulsen.

The motives behind the barratrous acts were mixed, as is often the case. They included personal motives, family motives, financial motives, and motives resulting from developments in the civil war. Some of the motives involved two or more of the elements mentioned. No doubt the fact that the communist armies and government controlled the areas where their families lived created economic and personal pressures on the masters and mariners, although there is no evidence of any threats of reprisal if they did not defect. But economic and personal pressures of one sort or another are behind every barratrous act. The pressures exerted in these cases do not prevent the acts of the masters and mariners from being barratry within the meaning of the policies, although they affect the question whether the barratry was or was not a "consequence of civil war" which will be discussed in VI, below.

Whether running up the red flag and holding the ships for the Communist Government also amounted to a "seizure" of the several ships, within the meaning of the f. c. & s. warranty and the exclusion clause, will be discussed in V, below.

■ Barratry cannot be committed against an owner with his consent. He cannot complain of an act to which he himself is a party. Arnould, sec. 849, 850. Respondents contend that since the manager of the Hong Kong branch office and many other employees of CMSN defected to the communist regime before January 16, 1950, and since some of them conspired with the masters and others to prevent the ships from sailing, it should be held that the owner consented to the barratrous acts. But the real owner was the Nationalist Government, and General Manager Wei and the other people at the head office of CMSN remained loyal. There is no substance to the argument that the owner was a party to the barratrous acts.

Nor did the owner consent to the barratrous acts on the Hai Hsuan. The radio message from the Hong Kong office directing the ship to proceed to Singapore was sent after the Hong Kong office had defected, and the message directing the chief officer to take over from Captain Hsueh was sent while the head office was being kept in the dark as to the true situation; the mutinous officers and crew had already assumed practical control of the ship, and Captain Hsueh was either unable or too scared to send a message telling the true situation.

If some or all of the Hong Kong vessels had been under time charter in December, 1949, or January, 1950, which I do not find to be a fact, that would not alter the conclusion that the masters and mariners were guilty of barratry against the owners.

B. *Effect of Government Ownership of the Vessels.* Respondents contend that it is not barratry for the citizens of a nation to change their political allegiance from one to the other of two competing governments of that nation. To support that proposition they cite Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 137, 58 S. Ct. 785, 791, 82 L.Ed. 1224, where it was held that "the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it, * * *." See also Lehigh Valley R. Co. v. State of Russia, 2 Cir., 21 F.2d 396; The Rogdai, D.C.N.D.Cal., 278 F. 294.

But the instant suits present a problem which was not involved in those cases. The United States did not sell the ships to the Chinese nation or the Chinese state, but to "the Government of the Republic of China". That is the government which was and is popularly called the Nationalist Government. The insurer knew this, and wrote its policies accordingly. At the time of the sale a communist regime controlled a large portion of northern China, and claimed to exercise governmental authority over part, at least, of the territory it controlled. On October 1, 1949, the communists proclaimed the Central People's Government (the Communist Government) to be the government of all China. The Government of the Republic of China (the Nationalist Government) continued to function, although it was forced to move several times, finally to Taipei, Taiwan. It is still recognized by the United States as the de jure government of China, and is a member of the United Nations, although the Communist Government was recognized by the British Government as the government of China on January 5, 1950.

■ With knowledge of these facts, respondents, both before and after October 1, 1949, and after January 5, 1950, issued policies of insurance to the Government of the Republic of China as the named insured and accepted premiums thereon. Respondents are estopped to deny that the ships were owned by the Government of the Republic of China, the Nationalist Government, as distinguished from the sovereign state or national entity, China. Indeed, it is hard

to tell what the sovereign state or national entity, China, should be considered to embrace, in view of the history of that country and the existence during all material times of two governments, each controlling part of the territory which was included in the Chinese empire and the Republic of China during most of the last 500 years, including the years since 1945.

 But it is not necessary to rest the decision of this point on estoppel. Under United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, this court is bound to accept the political decision of the Department of State that the Nationalist Government is still the de jure government of China. That decision forbids this court to conclude that the Communist Government or any of its agents had the legal right to take over the ships.

The hard problems of the political and legal consequences of recognition or non-recognition are fully discussed in The Maret, 3 Cir., 145 F.2d 431, 439, et seq. The court there concluded: "When the fact of nonrecognition of a foreign sovereign and nonrecognition of its decrees by our Executive is demonstrated as in the case at bar, the courts of this country may not examine the effect of decrees of the unrecognized foreign sovereign and determine rights in property, subject to the jurisdiction of the examining court, upon the basis of those decrees." 145 F.2d 442.

It is true that the British Government has recognized the Communist Government as the government of China, and has recognized its right to sovereign immunity in suits involving title to the Hai Hsuan and to other property which the Communist Government claims to own. The Hai Hsuan, United States v. Yang Soon-Ee and another, 1 Malayan L.R. 63 (1950); Civil Air Transport, Inc. v. Chennault et al., 34 Hong Kong L.R. 358, aff'd 34 Hong Kong L.R. 386, rev. after issuance of an Order in Council, Civil Air Transport, Inc. v. Central Air Transport Corp., (1953) A.C. 70, (1952)

2 Lloyd's R. 259. But neither the Singapore court nor the Privy Council held in those cases that the Chinese Communist Government had acquired legal title to the Hai Hsuan or to the airplanes, or the legal right to control them, (a) by the proclamation of the Communist Government on October 1, 1949, or (b) by its purported dismissal of the ministers of the Nationalist Government on that date, or (c) by the letter of November 12, 1949, from Chow En-loi (Chou En-lai), Premier of the Communist Government, addressed to all officers and workmen of China National Aviation Corp. and Central Air Transport Corp., directing them to "protect" the assets of the corporations.

In the CAT case no order to "take over" the airplanes was issued by the Communist Government until January 13, 1950. In the meantime the airplanes had been sold by the Nationalist Government to Chennault et al., in December, 1949. The Privy Council held that in December, 1949, the Nationalist Government owned the airplanes and had the right to sell them. In the instant suits, no order to "take over" the ships was offered in evidence. The statement of Chou En-lai published in the Hong Kong newspaper on January 10, 1950, calling on all personnel of organs of the "former Kuomintang Central and local government" in Hong Kong "to safeguard state property and archives, await the taking over", etc., went no further than the letter of November 12, 1949, dealing with the airplanes, which the Privy Council held not to be an order to "take over". The declaration of March 18, 1950, set out in the statement of facts, above, was issued two months after the masters defected and ran up the red flag. Under Pink, Maret, and other cases, this court cannot give any effect to the declaration of March 18, 1950; but even if this court could, that declaration could not change the character of the *previous* barratrous acts of the masters and mariners nor prevent those acts from being the cause of the constructive total loss of the vessels to CMSN and the

Nationalist Government in January, 1950.

The question whether or not the acts of the Chinese masters and mariners were barratrous, however, presents different problems from those involved in the cases cited. We are not dealing here with the claim of the Communist Government to be the legal owner of the ships. Of course, such a claim would have to be denied by an American court. The Maret, supra. We are dealing with the proper characterization of the acts of the Chinese masters and mariners, in the context of the insurance policies and in the light of the facts. As Judge Lehman said in Russian Reinsurance Co. v. Stoddard, 240 N.Y. 149, at page 158, 147 N.E. 703, at page 705: "We do not pass upon what such an unrecognized governmental authority may do, or upon the right or wrong of what it has done; we consider the effect upon others of that which has been done, primarily from the point of view of fact rather than of theory." This conclusion is similar to that reached in the marine insurance cases arising out of the American Civil War. Dole v. Merchants' Mutual Marine Ins. Co., 51 Me. 465; Fifield v. Insurance Co., 47 Pa. 166; Mauran v. Alliance Insurance Co., 6 Wall. 1, 18 L.Ed. 836.

The Chinese masters and mariners were employed by CMSN, a corporate agency of the Nationalist Government. They were paid by that agency, and had custody of its ships as its officers or employees. The ships were flying the flag of the Nationalist Government until January 16, 1950 (January 26, in the case of the Hai Hsuan). Under the laws of the Nationalist Government, to which they owed allegiance, they were bound to obey the orders of General Manager Wei. Any wilful failure to do so was barratry, under Chinese, British and American law.

In The Jupiter No. 3, (1927) Prob. 122, the U. S. S. R. had attempted by decrees issued in January, 1918, and March, 1919, to transfer the Jupiter and other property of a Petrograd company to the Russion S. F. S. R. At the time of the decrees, the Jupiter was in Odessa, which was not in the territory of the Russian S. F. S. R. or of the revolutionary government of North Russia. The Jupiter sailed to France, where a French court appointed a M. Bourgeois administrator for the White Russian owners. In March, 1924, while the Jupiter was at Dartmouth, England, the master, Lepine, who had custody of the ship on behalf of the administrator, handed her over to a representative of the U. S. S. R. The British admiralty court held: "* * * in March, 1924, when Lepine allowed the U. S. S. R. to take possession of the ship, Mr. Bourgeois was in actual possession and had the right to possession. Lepine may have acted as a loyal subject of the U. S. S. R., but he betrayed his trust to his employers." (1927) Prob. at 135.

The Jupiter No. 3 was cited with apparent approval in Compania Espanola, etc. v. The Navemar, 303 U.S. 68, 76 note, 58 S.Ct. 432, 82 L.Ed. 667. See also Compania Naviera Bachi v. Hosegood & Co., Ltd., (1938) 2 All England Law Reports 189. The acts of the masters and mariners in the instant cases were clearly barratrous, under both British and American law.

### IV. Proximate Cause

The general rule of proximate cause is stated in the opinion of Chief Justice Hughes in Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co., 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422, in which he approves the discussion of the subject by Lord Shaw in Leyland Shipping Co. v. Norwich Union Fire Ins. Soc., (1918) A.C. 350, 368–371. "Causation is not a chain but a net." We must seek "the real efficient cause" of the loss. 302 U.S. at pages 562, 563, 58 S.Ct. at page 374.

Libelants contend that a special rule of proximate cause is applied in barratry cases; that if barratry is a cause of the loss, recovery may be had under a policy insuring against barratry, even though the immediate cause of loss may not have been covered by the policy. Whether or not such a special rule exists

for barratry cases has been hotly debated in England. See discussion by the various law lords in Cory v. Burr, 8 App. Cas. 393, and by Arnould, sec. 858, n. 32. It would prolong this opinion unduly to review that controversy here. I conclude that where barratry is one of the causes of the loss, if the ultimate cause (such as stranding or capture) is not excluded from coverage by a warranty or an exclusion clause, recovery may be had on the grounds of barratry, whether or not the ultimate cause of loss was or was not a peril insured against. See e. g. Arcangelo v. Thompson, 2 Camp. 620. But where the ultimate cause of the loss is excluded from coverage by a warranty or an exclusion clause, recovery may not be had on the grounds of barratry. See Cory v. Burr, supra; Swan v. Union Insurance Co., 3 Wheat. 168, 16 U.S. 168, 4 L.Ed. 361.

The decision in Calmar S. S. Corp. v. Scott, on remand, 2 Cir., 209 F.2d 852, is not to the contrary. The exclusion clause in that case excluded only a claim based upon delay, and did not exclude a claim based upon and due primarily to a covered risk, to which delay was merely a contributing factor.

In each of the policies involved in the instant cases seizure is specifically excluded by the f. c. & s. warranty in the marine risk policies and by the exclusion clause in the war risk policies. Therefore, if there was a seizure, and if it was the ultimate cause of the loss, there can be no recovery.

## V. Seizure

The f. c. & s. warranty in the marine risk policies excludes from coverage "any claim for loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; * * *." It also excludes all "consequences of hostilities" (except certain physical consequences) and "consequences of civil war". The war risk

policies, which cover those risks which would be covered by the marine risk policies in the absence of the f. c. & s. warranty but which are excluded by that warranty, contain a clause "excluding capture and seizure". For the purposes of this case "warranted free from" and "excluding" may be considered to have the same meaning.

Respondents concede that there was no "capture" of any of the seven ships, but contend that the loss in each case was due to a "seizure". Every capture is a seizure, but there may be seizures which are not captures. Dole v. Merchants' Mutual Marine Ins. Co., 51 Me. 465, at page 472; Cory v. Burr, 8 App.Cas. 393, at 405; Arnould, sec. 905.

The meaning of the term "seizure" will be considered first in its popular usage; then as it would be used and understood by experienced marine insurance brokers and underwriters, in the light of decided cases and generally accepted texts; and finally, in the context of the documents and in the context of the transactions between the assured's broker and the insurer's agent.

*A. Popular Usage.* The popular meaning of "seizure" is given by Webster as "Act of seizing, or state of being seized; sudden and forcible grasp or clutch, a taking into possession; as the seizure of a thief, a throne, etc.", and by the Oxford English Dictionary as "The action or act of seizing, or the fact of being seized; confiscation or forcible taking possession (of land or goods); a sudden and forcible taking hold". The original meaning of the word "seize" was "to put in legal possession of a feudal holding". Its use in law now generally means "to take possession of, in order to subject to the force or operation of a warrant, order of court, or other legal process". Its popular meaning has come to be "to take possession of by force", "to lay hold of suddenly or forcibly", "to clutch". The popular meaning is broad enough to cover the mutinous acts of the officers and crew of the Hai Hsuan as she approached Singapore, and possibly also the acts of the masters of

the six Hong Kong vessels, who, with the approval of most of their officers and crews, ran up the red flag and held the ships for the Communist Government. See Compania Espanola v. The Navemar, 303 U.S. at page 70, 58 S.Ct. at page 433; United States v. Reid, D.C.D.Del., 210 F. 486; United States v. Brush, C.C. S.C., Fed.Cas.No.14,677a; In re Trunan, 5 B. & S. 645, 122 Reprint. 971, 985; Falkner v. Ritchie, 2 M. & S. 290, 105 Reprint. 389. Indeed representatives of libelants have used the word "seized" to describe what happened to the ships: (1) in an affidavit made by an attorney for Eximbank in August, 1950; (2) in an affidavit made by K. Y. Pao, Special Representative of the Ministry of Communications of the Nationalist Government; and (3) in paragraph 19 of the Hai Hsuan libel, filed in this court, although the word was not used in the libels making claim for the loss of the six Hong Kong vessels.

*B. Marine Insurance Authorities.* But it is very doubtful whether the term "seizure", as used in marine insurance policies, has such a broad meaning. None of the cases cited in the previous paragraph was an insurance case except Falkner v. Ritchie, and that case did not deal with the meaning of the words "seized" or "seizure". Libelants contend that, as used in marine insurance policies, the term "seizure" includes three elements which are not present in this case, namely: (1) a taking of the vessel by someone other than her master, officers or crew; (2) the use or threat of force; and (3) action by a government or its authorized representatives. Respondents deny that these are necessary elements of a seizure, and, in the alternative, argue that all of them are present in these cases. It must be remembered that in some of the cases cited a loss due to seizure was covered by the policies involved, and in some of them it was excluded from coverage by an f. c. & s. warranty or otherwise.

(1) *Can there be a seizure of a vessel by her master, officers or crew?* In other words, can there be a barratrous seizure, or are the terms "barratry" and "seizure" mutually exclusive? The answer to this question depends largely upon how much weight is accorded to the opinion in Greene v. Pacific Mutual Ins. Co., 9 Allen 217, 91 Mass. 217. That was a suit upon a hull policy for loss by barratry of the mariners. The barratry was a simple mutiny, by which the officers were overthrown. The underwriters defended on the f. c. & s. warranty, claiming that the vessel had been seized by the crew. The court, however, entered judgment for the assured. Bigelow, C. J., speaking for the whole court, said: "Inasmuch as barratry is one of the risks assumed by the assured (sic), unless particular acts are clearly excepted in terms which leave no doubt as to their meaning, the general words of the policy must have full operation. 1 Phil.Ins. § 1163. Lawrence v. Aberdein, 5 B. & Ald. 107."

"But", Judge Bigelow continued, "we do not deem it necessary to put the decision of this point on so narrow a ground. Upon careful consideration, we are of the opinion that the exception of a loss by seizure does not include the risk of mutiny of the mariners and the forcible taking of the ship from the control of the officers; or, in other words, that it does not properly exclude from the operation of the policy a loss by barratry. Certainly the word 'seizure' cannot be applied to any barratrous act of the master. He has by law possession and control of the ship. He may, it is true, take her out of her course, or convert her to his own use in violation of his duty to the owners. But he can not be justly said to seize that which is already in his own keeping. The same is true to a certain extent of the mariners. While in the discharge of their duty they have a qualified possession of the vessel. Subject to the order of the master, it is in their care and custody. If they violate their duty and disobey the master, displace him from command and assume entire control of the vessel, it is a breach of trust rather than a seizure. Lawton v. Sun Mutual Ins. Co., 2 Cush. [Mass.]

500, 514. It can be properly described only as barratry, in like manner as misappropriation of money by a servant or agent to whom it is intrusted is, correctly speaking, embezzlement, and not larceny. Indeed, the word 'seizure', as applied to the contract of insurance, may be said to import the taking possession of a ship or vessel by superior force, or by violence from without, and not a barratrous conversion of her by the officers and crew, or either of them. No adjudicated case can be found in which it has been interpreted to include an act of the latter character. The recent case of Kleinwort v. Shepard, 1 El. & El. 447 [120 Reprint 977], cited by the defendant's counsel, is authority only for the position that a forcible dispossession of the master and mariners by passengers acting mutinously might properly be deemed a seizure. We are not prepared to say that the conclusion arrived at by the court in that case was a sound one. But it differs essentially from the case at bar in the leading fact that the ship was there forcibly taken possession of by persons who were incapable of committing an act of barratry, because they had no care or custody of the ship, and stood in no relation of trust towards the owners. There was some ground, therefore, for regarding the mutinous act of the passengers as violence from without, and so within the warranty which exempted the insurers from loss by seizure. That the word was not intended to be used in any broader sense, in the policy declared on, so as to embrace the barratrous acts of the crew, is manifest from the connection in which it stands in the warranty. The exemption is from liability for loss by reason of capture, seizure or detention. Capture and detention are both risks which can arise only from acts of persons having no connection with the ship, who take her out of the possession of the master and mariners forcibly, either without right or by the authority of law. The rule of interpretation, that words coupled together in the same sentence are to be understood and construed *in eodem sensu*, warrants the conclusion that 'seiz-

ure' was intended to be understood as having reference to a similar class of risks, and to exempt the insurers from liability to loss arising from a forcible taking of the vessel by others than the officers or crew." 91 Mass. at pages 221, 222.

I have quoted at length from Greene because it is the *only* case which has *decided* whether a ship can be seized by her master or her crew. Kleinwort, discussed in Greene, involved a mutiny by coolie passengers, not by the crew. There is a dictum in Kleinwort: "If the crew, intending to turn pirates, were to murder the captain and run away with the ship, would not this be a loss by seizure?" But although the decision in Kleinwort has been frequently cited with approval, in this country as well as in England, I have found no case which has approved the dictum. There is no conflict between the decision in Kleinwort and the decision in Greene.

■ In The Minden, 1942 A.C. 50, and two other cases decided at the same time, German ships were carrying British-owned cargo, which was insured against seizure. When World War II broke out, the German masters attempted to take their vessels and cargo to German ports. In each case the master was acting in accordance with specific instructions received from the German Government, to which both he and shipowner owed allegiance. The House of Lords held that the master had seized the goods, in the sense that he had ceased to hold them as carrier. The Minden presented a different problem from Greene; the relation of master and shipowner to cargo-owner, which is that of carrier and shipper, is different from the relation of master and crew to shipowner, which is that of master and servant. The master and crew owe to the shipowner the duty of loyalty and obedience, the breach of which is barratry. Barratry can be committed only against an owner or charterer, not against cargo. Arnould, sec. 849. There was no barratry in The Minden; the master acted

in the interests of the German shipowner as well as of the German Government.

Greene has been repeatedly cited by text writers in the United States to support the statement that the term "seizure" does not include a violent taking of possession of the ship by a mutinous crew. 1 Phillips, Insurance, 5th ed., 1867, p. 652; 1 Parsons, Law of Marine Insurance, p. 584; Richards on Insurance, 4th ed., 1924, p. 834; 5 Appleman, Insurance Law & Practice, 1941, sec. 3256, n. 37. No doubt, as respondents contend, some of these text writers have accepted Greene uncritically; but the important point is that an American marine insurance broker or underwriter, or his lawyer, who consulted the texts, would find Greene the accepted authority.

(2) *Is the use or threat of force a necessary element of seizure?* The definitions in Webster and the O. E. D. to this effect are confirmed by Black's Law Dictionary (Fourth Ed.): "To take possession of forcibly, * * *." I have found no case holding that there was a seizure of a ship or its cargo, or of goods on land, where superior force was not used or threatened, although actual violence is not necessary. The three cases cited by respondents support this conclusion. In Robinson Gold Mining Co. v. Alliance Ins. Co., (1904) A.C. 359, a shipment of gold was taken off a train in the territory of the South African Republic by a government official, under a threat of force by the government. As Lord MacNaghten said: "The gold was not given up by the owners or by persons authorized by the owners to give it up. It was taken with a *high hand* from the carriers to whom it had been entrusted for safe carriage * * *." In The Minden, supra, Lord Wright said: "The restraint which was operating on the master was the compelling force of the German State to which he was subject." (1942) A.C. 50, at 80. In Cory v. Burr, 8 App.Cas. 393, the seizure was by a Spanish revenue cutter acting in the normal performance of her duties. Force was present, but there was no resistance and hence no violence.

(3) *Is action by a government or its authorized representatives a necessary element of seizure?* The answer in England is clearly "no". Kleinwort v. Shepard, 1 El. & El. 447, 120 Reprint 977; Johnston & Co. v. Hogg, 52 Q.B.D. 343 (1883); Arnould, sec. 829. Most of the American cases turned on the question whether the Confederacy was a de facto government, although Kleinwort was cited with approval in most of them. Dole v. Merchants' Mutual Marine Ins. Co., 51 Me. 465; Dole v. New England Mutual Marine Ins. Co., C.C., Fed.Cas. No.3,966; Dole v. New England Mutual Marine Ins. Co., 6 Allen, Mass., 373; Fifield v. Insurance Co., 47 Pa. 166; Mauran v. Alliance Insurance Co., 6 Wall. 1, 18 L.Ed. 836. Some of those cases dealt with capture as well as seizure. In Mauran the court held that in a capture by a de facto government there can be no question between the insurer and the insured as to the lawfulness of the government under whose commission the capture has been made. See also Swinnerton v. Columbian Ins. Co., 37 N.Y. 174.

However, even if action by a governmental agent is necessary to constitute seizure, action by a volunteer subsequently ratified by the government, or in line with the government's policy, would appear to be sufficient. See, by way of analogy, Atlantic Mutual Ins. Co. v. King, (1919) 1 K.B. 307; The Amiable Isabella, 6 Wheat. 1, 66, 5 L.Ed. 191; Carrington v. Merchants' Ins. Co., 8 Pet. 495, 522, 8 L.Ed. 1021; Compania Espanola, etc. v. The Navemar, 303 U.S. 68, 75, 76, 58 S.Ct. 432, 82 L.Ed. 667.

C. *The Context of the Documents and the Context of the Transactions.* The marine risk policies are in a customary form, with an f. c. & s. warranty. The terms of this warranty have varied from time to time over the years. Its history and purpose were discussed by Atkin, L. J., in The Petersham, Britain S. S. Co., Ltd. v. The King, (1919) 2 K.B. 670. See also cases cited by Mr. Justice Black in Standard Oil Co. of New Jersey v.

United States, 340 U.S. 54, 55 n., 71 S.Ct. 135, 95 L.Ed. 68; Cory v. Burr, 8 App.Cas. at 395, 400, 404; Dole v. New England Mutual Ins. Co., 6 Allen at page 385, 88 Mass. at page 385; Greene v. Pacific Mutual Ins. Co., 9 Allen at page 220, 91 Mass. at page 220; and Arnould, sec. 905, et seq., and sec. 10, n. 37.

The f. c. & s. warranty excludes from the coverage of the marine risk policy certain losses, even though they are caused by one of the perils insured against, such as acts of enemies or pirates, takings at sea, arrests, restraints, and detainments of kings, princes and peoples, if such losses are caused by "capture, seizure, arrest, restraint or detainment, or the consequences thereof or any attempt thereat, or any taking of the vessel by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise"; it also excludes all consequences of hostilities, etc. Some of the perils included in the insuring clause are eliminated entirely by the warranty, e. g. arrests, restraints and detainments; some are eliminated only in certain cases, e. g. acts of enemies or pirates, which are excluded only when they amount to capture, seizure, etc., or when an excluded peril is the real cause of the loss. If "barratry" and "seizure" are not mutually exclusive terms, the f. c. & s. warranty excludes from the coverage of the marine risk policy barratrous acts which amount to a seizure or are followed by a seizure as the ultimate cause of the loss.

The f. c. & s. warranty also excludes from the coverage of the marine risk policy any barratry which is a consequence of civil war, although such barratry may be covered by the war risk policy.

The war risk policies cover those risks, including barratry, which would be covered by the marine risk policy in the absence of the f. c. & s. warranty but which are excluded by that warranty. As originally written, the war risk policies did not exclude capture and seizure. They did contain certain trading warranties, which were modified from time to time

to limit the ports in China at which the ships could touch. The purpose of the trading warranty was to prevent the ships from touching at those ports in China where they were in danger of being captured, seized or detained by communist troops, ships or port officials. The trading warranties originally excluded only ports in northern China occupied by the communists, but other ports were excluded later. In June, 1949, when the communist armies were rapidly extending their conquests down the coast of China, the clause "excluding capture and seizure" was added to the war risk policies, evidently because the insurers feared that the ships would trade so near the coast of China that they might be captured by communist gunboats or sampans, whether operated by the communist navy, port authorities or others, and because a clause which merely excluded certain ports would rapidly become obsolete.

If the insurer had feared the masters and mariners of the ships themselves, as well as the communist gunboats and port officials, and had wished to be free of the risk of defection by the masters and mariners, the insurer could have excluded barratry from the risks assumed, or could have inserted a clause clearly excluding a loss caused by the defection of masters or the mariners. No precedent has been cited or found in which the word "seizure" has ever been held to cover or not to cover the case of a master or mariners who defected to the opposite side in a civil war.

*The instant suits.* When libelants' three tests are applied to the facts, it develops not only that the instant suits are quite different from any precedent relied on by either side, but that the case of the Hai Hsuan is different from the cases of the six Hong Kong vessels.

In the case of the Hai Hsuan, tests (2) and (3) are clearly met. If the testimony of Captain Hsueh is to be believed—and libelants, having produced him, are in no position to question it— the mutinous officers and crewmen on the Hai Hsuan threatened violence to

the captain, expressly or impliedly, and took the ship from his custody and control by the use or threat of superior force. They did not intend to use the ship for their own purposes, but acted as volunteers on behalf of the Communist Government in taking the ship into Singapore harbor, running up the red flag, and refusing to deliver the ship to Captain Paulsen. Whether or not this action was authorized by the Communist Government, or one of its agencies, it was ratified and adopted by the Communist Government.

The problem in the case of the Hai Hsuan is with test (1), whether there can be a seizure of a ship by some of the officers and crew out of the control of the master and against the interest of the lawful owners. Greene says "no", the dictum in Kleinwort, "yes". But neither of those opinions considered the question of defection to the opposite side in a civil war. Unless it should be broadly held, as it was in Greene, that there can never be a barratrous seizure, it would appear that in the case of the Hai Hsuan the loss was caused both by barratry and by seizure.

The facts in the six Hong Kong cases are different. Test (3) is met, because the masters acted as volunteers for the Communist Government in running up the red flags and holding the ships for that government. They did not attempt to hold the ships for their own benefit or for the benefit of the crew, as pirates or otherwise. Although their acts were not authorized in advance by the Communist Government, they were later ratified by that government.

Whether test (2) is met is debatable. The flags were changed and the ships held for the Communist Government and its agencies by the deliberate decision of their respective masters, with the approval of the great majority of the officers and crew. Not only was there no violence, there was no show of force or threat of violence by the communist troops or agents or by anyone else. The fact that a few members of one or more of the crews were "dis-gusted" does not prove that force was used or threatened. Neither does the fact that communist agents on the ships or in Hong Kong may have persuaded some of the masters and others to refuse to sail to Taiwan and to take or acquiesce in the final action of changing the flags. There is no evidence that any communist agents went beyond argument and persuasion in securing the defection of the masters and mariners. No doubt the men were made acutely conscious of the fact that their families lived in Shanghai or other areas controlled by the communists; but there is no evidence that any reprisals were actually threatened if they did not change sides. The instant suits are different from The Minden. There "the restraint which operated on the master was the compelling force of the German State to which he was subject". (1942) A.C. 50, at 80. The masters and the crewmen in the instant suits were employees of CMSN, an agency of the Nationalist Government. They owed allegiance to that government and loyalty to CMSN. Despite the difficult personal decision which each master, officer and crewman had to make, there was no "compelling force" to which the defecting masters, officers and crewmen were subject.

The problem under test (1) as applied to the six Hong Kong vessels is whether barratrous action by a master can ever amount to a seizure. In each instance the change of flag was the deliberate act of the master, with the approval of the great majority of his officers and crew. As the Massachusetts court said in Greene, "Certainly the word 'seizure' cannot be applied to any barratrous act of the master. He has by law possession and control of the ship. He may, it is true, take her out of her course or convert her to his own use in violation of his duty to the owner. But he can not be justly said to seize that which is wholly in his own keeping. The same is true to a certain extent of the mariners." This statement of the law has been accepted by American text writers; and there is no decision to the

contrary in England. The underwriters must have been familiar with it. Its application to the facts of these cases has not been shown to be contrary to the intention of the parties, as such intention may be gathered from the context of the policies and of the series of transactions between the assureds' broker and the insurer's agent. If an insurer wishes to exclude coverage for the barratrous acts of a master in changing sides in a civil war, running up the revolutionary flag and holding his ship for the other government, it should say so explicitly, and not rely upon such ambiguous clauses as we face in these cases. The policies were prepared by the insurer and its agents; any ambiguities must be resolved against the insurer. Marine Ins. Co. v. McLanahan, 4 Cir., 290 F. 685; Calmar S. S. Corp. v. Scott, 2 Cir., 209 F.2d 852.

■■■ I conclude that there was no seizure of the six Hong Kong vessels. If the burden of proof rests on libelants on this issue, it has been met. It is, therefore, unnecessary to determine the disputed question of who has the burden of proof on this issue. See Munro, Brice & Co. v. War Risks Ass'n, (1918) 2 K.B. 98; Arnould, sec. 905b; Couch, Cyclopedia of Insurance Law, (1931 ed.) sec. 2217; American Merchant Marine Ins. Co. of New York v. Liberty S. & G. Co., 3 Cir., 282 F. 514; cf. New York & Cuba Mail S. S. Co. v. Continental Ins. Co., 2 Cir., 117 F.2d 404.

■■■ Whether there was a seizure of the Hai Hsuan, within the meaning of the policies, presents a more difficult problem. The barratry was that of the mariners alone, who threatened violence to the captain, expressly or impliedly, and took the ship from his custody and control by the use or threat of superior force. The case comes within the dictum of Kleinwort. Even Greene recognizes the distinction between the "possession and control" of the ship by the master, and the "qualified possession" by the mariners. Able and experienced proctors for libelants, in Article 19 of their libel in the Hai Hsuan case, twice referred to the Hai Hsuan as having been seized. No similar language was used in the libels dealing with the six Hong Kong vessels. It appears that libelants recognized the distinction between the cases, believed that the Hai Hsuan had been seized, and relied for recovery in that case upon Arnould's doctrine that a special rule with respect to proximate cause applies in barratry cases. That rule was strongly urged by libelants, but I cannot follow it. See discussion in IV, above. I conclude that there was a seizure of the Hai Hsuan.

## VI. Whether the Losses of the Six Hong Kong Vessels Were Covered by the Marine Risk Policies or the War Risk Policies

Since the same company was insurer on all of the policies, the question is important only because there were different re-insurers. "Consequences of hostilities" and "consequences of civil war" are excluded from the marine risk policies by the f. c. & s. clause. The war risk policies cover the risks which would have been covered by the marine risk policies except for the f. c. & s. clause, and also cover "the risks of * * * civil war, revolution, rebellion, insurrection or civil strife arising therefrom". As we have seen, the barratrous acts of the masters and mariners were induced by a variety of motives, and many of them were influenced by communist agents on the ships and in Hong Kong, whose activities were in the interest of one of the parties in the civil war. The masters and mariners did not attempt to hold the vessels for their own use, as pirates or otherwise; they refused to sail out of Hong Kong while they debated whether or not to change their loyalties; and they finally decided to defect, and to hold the ships for the Communist Government. The change of flags was certainly a "consequence of civil war", in the popular use of those words. No case construing the combination of phrases used in these policies has been cited or found. World War II produced a number of cases in which the courts were called upon to determine the mean-

ing of the phrase "consequences of hostilities". In most cases they have held that indirect consequences of hostilities are covered by marine risk policies, and that only direct consequences of hostilities are covered by war risk policies. Arnould, sec. 905c to 905i; Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68.

 I conclude, however, that the terms "consequences of civil war" and "the risks of * * * civil war, revolution, rebellion, insurrection or civil strife arising therefrom" were intended to cover a broader range of events than "consequences of hostilities", and that the losses of the six Hong Kong vessels were covered by the war risk policies.

### VII. Sue and Labor

Each of the policies contained the following clause:

" * * * and in case of any Loss or Misfortune, it shall be lawful to the Assured, his or their Factors, Servants and Assigns, to sue, labor, and travel for, in and about the Defense, Safeguard and Recovery of the said Vessel or any part thereof, without Prejudice to this Insurance: to the Charges whereof the said Company will contribute according to the Rate and Quantity of the Sum herein assured. And it is especially declared and agreed that no acts of the Insurer or Insured in recovering, saving or preserving the property insured, shall be considered as a waiver or acceptance of abandonment."

 This is the customary English form of the clause, as distinguished from a form sometimes used in America, which provides: "It shall be lawful and necessary to and for the assured", etc. Although the customary clause is couched in permissive terms, an assured has always been required to labor diligently for the recovery of the property; he must take such action as a prudent uninsured owner would take under similar circumstances. Templeman on Marine Insurance, p. 115; Winter on Marine

Insurance, p. 156; Arnould, sec. 865; American Merchant Marine Ins. Co. of New York v. Liberty Sand & Gravel Co., 3 Cir., 282 F. 514, 522; George Cohen Sons & Co., 21 Lloyd's L.R. 30 (K.B.D. 1925); Franklin Ins. Co. v. Cobb, 2 Cinc.Super.Rep. 87, 13 Ohio Dec.Rep. 785 (Taft, J.). See also Intermondale Trading Co. v. North River Insurance Co., D.C.S.D.N.Y., 100 F.Supp. 128, where the policy contained the word "necessary".

 Many pretrial motions in the instant suits dealt with sue and labor problems; see D.C., 142 F.Supp. 551. They were not stressed during the arguments following the trial on the merits, but respondents have not abandoned their affirmative defense on that ground, and libelants still press their claim for expenses. The United States has questioned whether there is any duty on a loss payee, not a named insured, to sue and labor. It is not necessary to decide that question, because it is clear from the evidence that not only the Chinese libelants but also the United States did everything which could reasonably be required of them to recover the ships. Respondents contend that libelants were required to use their utmost endeavor— a test which is not supported by the weight of authority and states the obligation too strongly; but even if that test were applicable, libelants' action meets it. Respondents neither took nor suggested any further action after libelants abandoned the vessels to them in April, 1950. The public interest requires both insured and insurer to labor for the preservation of the property; and to that end provision is made that this may be done without prejudice. Washburn & Moen Mfg. Co. v. Reliance Marine Ins. Co., 179 U.S. 1, 18, 21 S.Ct. 1, 45 L.Ed. 49. Competent counsel advised libelants that further litigation would be useless. The Order in Council issued in the CAT case was unprecedented, according to the uncontradicted evidence before me; but as soon as libelants learned of it, the United States twice requested a similar order, which was twice refused by the

British. The matter was fully discussed in the United States Senate, Dec. 1, 1950, 96 Cong.Rec. 16,011. See also Volume 475, Parliamentary Debates, pp. 2,070 et seq., House of Commons, May 24, 1950. Libelants were not required to take military action to enforce their request. I conclude that libelants are entitled to recover from respondents the $1,585.44 which they expended in attempting to prevent the loss and recover possession of the Hong Kong vessels, which should be equally apportioned among the six suits involving those vessels.

## VIII. Whether the United States Failed to Minimize its Loss in Respect of the Hai Hsuan

 In the Hai Hsuan suit respondents pleaded as an affirmative defense that libelant, the United States, subsequent to January, 1950, refused to accept payment of its mortgage interest in the Hai Hsuan, in violation of its legal obligation to minimize its loss; and, therefore, that any recovery in the case of the Hai Hsuan should be reduced by the amount of the interest of the United States in such recovery.

There is evidence that three separate groups showed an interest in purchasing the Hai Hsuan.

On October 19, 1951, American Ship Brokerage Corporation, David Cohen, President, on behalf of a Panama steamship corporation, proposed to purchase the Hai Hsuan from the Nationalist Government, transfer her to Panama registry and deposit $428,320 in escrow with a Washington bank to cover the interest of the United States. Maritime had no objection to this proposition, but on January 18, 1952, Cohen changed his proposal, increasing the amount of the escrow to $438,982.74 and to "provide in that escrow for the suitable cancellation of the mortgage and other claims, including interest and desirable features, along with payments to others, such as the possessor of the ship, and the transfer of the equity which the Nationalist Government of the Republic of China has

in the ship, * * *". The inclusion in the proposal of a payment to "the possessor of the ship", i. e. the Communist Government, brought the proposal into clear conflict with Foreign Assets Control regulations, 31 C.F.R. 500.201, 500.309–314, State of the Netherlands v. Federal Reserve Bank, 2 Cir., 201 F.2d 455, 457, 459, which had been made effective against the Chinese Communist Government on December 17, 1950, after the Red Chinese had entered the Korean War. Maritime wrote Cohen on February 4, 1952, calling his attention to these regulations, suggesting that the escrow would not be necessary if payment were made to the Chinese Nationalist Government, and stating that Maritime "would insist upon appropriate assurances that the vessel, upon delivery to its new owner, would not come under the control of the Chinese Communist Government nor would it engage in any trade now prohibited to American flag vessels".

On November 7, 1951, M. Aprabamian, a Greek national, on behalf of a Delaware corporation, proposed to purchase the Hai Hsuan, transfer her to United States registry, and give a new mortgage replacing the existing mortgage. His corporation could not qualify as a citizen under the Shipping Act, 46 U.S.C.A. §§ 802, 808, but Maritime was interested in the proposal and suggested Liberian registry as an alternative. Aprabamian evidently intended to purchase the equity in the ship from the Chinese Communists. On November 26, 1951, Maritime sent a memorandum to the State Department which was forwarded to the American Consul at Singapore, stating: "You are aware that there appeared to be no technical legal objection to such an arrangement; that the Department of State had offered no objection to such a sale if the Administration [Maritime] were assured that the vessel would not find its way into unfriendly hands; that the Foreign Assets Control Division of the Treasury Department stated that no applicable United States regulation would be violated thereby. The Administration, however, has taken the

position that it recognizes the Chinese Nationalist Government as the lawful owners of the vessel. The Administration therefore has decided that it is unwilling to enter into negotiations with any prospective purchaser of the above vessel unless such purchaser initiates negotiations with the Chinese Nationalist Government as the recognized owners. Should arrangements satisfactory to the Chinese Nationalist Government be worked out by the prospective purchaser, the Maritime Administration will then deal with such purchaser on the subject of payment of its mortgage interest in the vessel."

On November 26, 1951, Simpson, Spence & Young, ships' agents, telegraphed Maritime, stating that Wallem & Co., of Hong Kong, had purchased the Hai Hsuan on condition that it satisfy the Maritime mortgage; they asked for the exact figure necessary to cancel the mortgage. In later telegrams, dated November 28 and 30, 1951, they told Maritime that the seller of the Hai Hsuan was "China Merchants Steam Navigation Company, Hong Kong" (i. e. the group that had defected to the communist regime); that the said seller would receive all of the purchase price of the vessel except that part paid to Maritime; and that the intended trade was worldwide with all China excluded. Maritime was asked to give a decision by December 4, 1951. On December 1, 1951, the Counsellor of the Chinese Embassy at Washington sent a letter to Maritime stating that the Nationalist Government had not sold the ship or authorized a sale, and urging that Maritime "do nothing to countenance or facilitate this illegal 'sale' of the vessel by the repudiated former Hongkong office which has defected to the Communists. To accept payment of mortgage indebtedness from a concern claiming title from such a source might lend color of sanction by the United States Government to the 'sale'. Such a 'sale' would * * * be definitely against the interest of the [Nationalist] Government * * * Furthermore if [Maritime] refrains from giving any encouragement to that 'sale', the prospective purchaser might not be willing to go forward with it * * *". On December 5, 1951, Maritime telegraphed Simpson, Spence & Young that the United States would not release the Hai Hsuan from the mortgage, because "China Merchants Steam Navigation Company, Hong Kong," was not the vessel owner. Maritime, as well as State, knew that Wallem & Co., the prospective purchaser, was and had been acting for the Chinese communists. Wallem & Co., came within the definition of "foreign country" in the Foreign Assets Control regulations, 31 C.F.R. 500.301 (c). The negotiations on behalf of Wallem never reached the stage of a formal offer to pay off the mortgage.

It is apparent that all three of the proposed transactions involved a recognition of the Communist Government as owner of the vessel, and pressure by the United States on the Nationalist Government to acquiesce in a sale by the communists. The Cohen deal also involved a payment to the Communist Government by a bank in the United States, which would have violated 31 C.F.R. 500.201(a). The Wallem deal involved a transfer of the security title of the United States, together with any additional rights as a result of the default, to a prohibited person, also in violation of 31 C.F.R. 500.201(b). The Aprabamian deal did not include an offer to pay off the mortgage on the Hai Hsuan, but merely to give a new mortgage in place of the old one; no unreasonable conditions were imposed by the United States, but Aprabamian was not able to work out the necessary details.

It is, of course, true that an insured must take all reasonable steps to minimize his loss. Arnould, sec. 799a; Columbian Insurance Co. of Alexandria v. Ashby, 4 Pet. 139, 143, 7 L.Ed. 809. The same obligation should probably be placed on a mortgagee-loss payee who is a real party in interest in the claim. The United States would not have been justified in turning down bona fide offers to pay off the mortgage, to please the Chinese

Nationalists, or because of some policy adopted by Maritime or by the United States Government, unless the offers violated statutes or regulations which would have been binding on any and all United States citizens insured under similar policies. But where the offers did violate such laws, as in the case of the Cohen and Wallem proposals, the insurer had no right to require the United States to take action (i. e. to amend the laws or the regulations) which no other insured could possibly have taken, and which would have been contrary to the public policy of the United States, to which the sole insurer, National Union Fire Insurance Company, owed allegiance. A fortiori, the insurer had no right to require the United States to recognize any claimed rights of the Chinese communists in connection with Aprabamian's proposal, which merely sought to give the United States a new mortgage in place of the old one.

## IX. Interest

The rule with respect to the allowance of interest in admiralty is stated in 3 Benedict on Admiralty, § 419, as follows: "In admiralty, interest on claims arising out of breach of contract is a 'matter of right but the allowance of interest on damages in cases of collision, or other tort or for unliquidated damages, is always in the discretion of the court and such interest may be allowed or disallowed by the district court or on appeal by the Circuit Court of Appeals or by the Supreme Court." See also The P. & T. Pathfinder, 4 Cir., 226 F.2d 137. Even where the damages are unliquidated, allowance of interest is the general rule, and "disallowance is supportable only in the face of 'exceptional circumstances.' * * * the rationale underlying the award of interest is the desire to make whole the injured party * * * and the presence or absence of 'exceptional circumstances' must always be determined in the light of that purpose". O'Donnell Transp. Co. v. City of New York, 2 Cir., 215 F.2d 92, 95. See also The P. & T. Pathfinder, supra; The Naiwa (Merritt & Chapman Derrick & Wrecking Co. v. United States), 4 Cir., 3 F.2d 381, 382; The Oakley C. Curtis, 2 Cir., 4 F.2d 979, 982.

Only two cases discussing the allowance of interest on marine or war risk insurance policies have been cited or found. Neither Arnould nor Phillips discusses the question. In Standard Oil Co. of New Jersey v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519, the government was sued on a war risk policy issued by it. The Supreme Court said, 267 U.S. at page 79, 45 S.Ct. at page 212: "The policies promised that claims would be paid within 30 days after complete proofs of interest and loss had been filed with the Bureau of War Risk Insurance. The proofs seem to have been filed on January 11, 1917. Interest at 6 per cent. should be allowed from February 11, 1917." In the instant cases, the policies did not provide specifically when claims would be paid, but respondents concede that it would not be unreasonable to allow interest from the date they denied liability after proper proofs of loss, unless there was unreasonable delay on the part of libelants in bringing or prosecuting the suits. I find that there was no such delay chargeable either to libelants or respondents.

In Calmar S. S. Corp. v. Scott, D.C.S.D.N.Y., 103 F.Supp. 243, at pages 268–269, Judge Ryan, without discussing whether it was a matter of right, held that the libelant was entitled to interest on the amount of the policy from the date when abandonment was tendered to the underwriters, and that interest should be allowed on "sue and labor" expenses. In a supplemental decision (not reported in the F.Supp., but which may be found in 1951 A.M.C. 1362) the court said: "I find no unreasonable delay on the part of libellant in the prosecution of this suit. I feel that interest should be allowed; the claims asserted are based on contracts. I have only been concerned with the rate of interest to be fixed. * * * "

Practice varies as to whether interest should always be allowed at the legal rate. See Rotterdamsche Lloyd v. Gosho Co.,

9 Cir., 298 F. 443, 445. In this district the rate of interest has been in the discretion of the court. See e. g. Isthmian Steamship Co. v. Jarka Corp. of Baltimore, D.C.D.Md., 100 F.Supp. 856, 861. See also Chesapeake & O. Ry. Co. v. Elk Refining Co., 4 Cir., 186 F.2d 30, 36 A.L. R.2d 329. The questions involved in this case are novel and close. Respondents were entitled to be reasonably sure of the facts before paying out the large sums claimed. Libelants and respondents alike had great difficulty in ascertaining the facts and interviewing the witnesses.

Considering all these circumstances, I conclude that interest should be allowed at the rate of 3% per annum from the date respondents denied liability after proper proofs of loss were filed, namely, April 28, 1950.

I will enter decrees in favor of libelants in Nos. 3508, 3510–3514 (the six Hong Kong vessels) against respondent National Union Fire Insurance Company and in favor of respondents in No. 3507 (the Hai Hsuan), in accordance with this opinion, each party to bear its own taxable costs in all suits.